[Crim. No. 7352.   In Bank.   July 14, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. RAYMOND FORREST TRELOAR, Defendant and Appellant.

Erling J. Hovden, Public Defender, Paul G. Breckenridge, Jr., and James L. McCormick, Deputy Public Defenders, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gordon Ringer, Deputy Attorney General, for Plaintiff and Respondent.

PEEK, J.—Defendant Treloar and a codefendant, Duvall, were convicted of 13 counts of robbery of the first degree (Pen. Code, §§ 211, 211a), two counts of kidnaping for the purpose of robbery without bodily harm (Pen. Code, § 209), and one count of murder committed during the course of one. of the robberies. (Pen. Code, § 189.) Additional counts included prior felonies which were charged against each defendant.

Upon the penalty phase the original jury, after deliberating for four days, was discharged. A second jury, again, after four days of deliberation, fixed the penalty at death as to defendant Treloar. However, as to his codefendant the jury remained deadlocked and ultimately the trial court sentenced him to life imprisonment, in lieu of ordering a new trial on the issue. (Pen. Code, § 190.1) Motions by both defendants for a new trial were denied as was a motion by Treloar for a reduction of penalty by the trial court. (Pen. Code, § 1181, subd. 7.) Treloar's appeal is automatic. (Pen. Code, § 1239, subd. (b).) Duvall did not appeal.

The murder charge arose out of one of a series of robberies all of which followed much the same pattern. At approximately 12:30 a.m. on February 10, 1962, Treloar and Duvall entered Farah's, a bar and restaurant in North Hollywood. According to Farah who was tending bar they ordered two drinks. He further commented that neither defendant ap-

peared to be intoxicated. However, according to Treloar, they had been drinking during the early evening and each had consumed five to seven drinks just prior to entering the bar. Treloar came up behind the victim, who was seated at the bar, and said, "This is a holdup, move!" The victim fell backward off the bar stool upon which he had been sitting. Apparently no one saw Treloar actually shoot the victim. According to Treloar the victim lunged at him and in some unexplained manner the gun was discharged.

A police expert testified that the bullet could have been fired with the Smith and Wesson .38 revolver which Treloar had; that the gun could be fired either by merely pulling the trigger or by cocking the hammer and then pulling the trigger; and that it would require approximately 3 pounds of pressure to fire the gun with the hammer cocked and 13½ pounds of pressure to fire it when the hammer was automatically cocked by pulling the trigger. He further testified that, based upon the condition of the fibres of the victim's coat, the muzzle of the gun was against the coat when the victim was shot.

After the shot, defendants forced the patrons into an adjoining room and ordered them to lie on the floor and surrender their valuables. Some of the patrons were hit or kicked, and both defendants used much profane language and acted in a threatening manner. When they left by car they took two women patrons as hostages. The women were taken about 4 miles, tied with tape and abandoned in the automobile.

The procedure followed in the described robbery was typical of the others. That is, the defendants would enter a bar after having been drinking elsewhere, would consume additional drinks and then stage the holdup. Although they were often threatening, violent and profane during the robberies, there was testimony from some of the People's witnesses as to acts of kindness by the defendants toward their victims.

Treloar does not question the sufficiency of the evidence to support the jury's determination of guilt nor does he otherwise question that phase of the case. It is likewise our conclusion, based upon our independent search of the record (see *People* v. *Ives,* 17 Cal.2d 459, 462 [110 P.2d 408]), that the issue of guilt was properly determined by the jury.

However, in the penalty phase he first contends that he was denied his right to a fair trial by virtue of the prejudi-

cial misconduct of the district attorney in his argument to the jury on the penalty phase. Secondly, he contends that he was further denied a fair trial by reason of the failure of one juror to disclose the fact that he was one of the victims or complaining witnesses in a prosecution for grand theft then pending.

We do not approve the actions of either the district attorney or the juryman. However it would appear unnecessary to discuss such contentions since by supplemental brief defendant has raised the identical issues discussed in *People* v. *Morse*, 60 Cal.2d 631 [36 Cal.Rptr. 201, 388 P.2d 33], decided while the instant case was pending on appeal, and we hold such issues to be controlling.

In the present case the question of the manner in which the jury should approach or consider the possibility of release on parole in the event of the choice of life imprisonment as the penalty was first raised during the course of *voir dire* examination. In questioning a prospective juror for the penalty trial the prosecutor stated: ''. . . a life sentence doesn't necessarily mean a life sentence, . . . an individual who has a life sentence can be eligible for parole after seven years.'' He then asked that juror: ''. . . would you take into consideration in considering the life sentence, the chances from the history and background evidence concerning these defendants, the chances that they might not be sufficiently rehabilitated by the time they were paroled so they would no longer cause a hazard to society?''

On four subsequent occasions the prosecutor asked prospective penalty jurors if they would consider whether the defendants, after serving the minimum seven years of a life sentence, would be rehabilitated sufficiently that their parole would not endanger society.[1] At other points during *voir dire* the deputy district attorney asked members of the panel if, in determining the proper penalty, they would consider ''that defendant had previously been in prison and had been released on parole, and then went on to commit other crimes.''

---

[1]One of the above panel members was asked: ''In determining the appropriate penalty, would you take into consideration that you at least should be satisfied that if he were given life imprisonment the possibility is there of the parole and that you believe in order to protect society that the individual should show that he can or has been rehabilitated before he be permitted to walk out of detention? . . .'' The juror replied, ''Well, I—wouldn't that be within the discretion of whoever does the paroling? This wouldn't be something I would determine?''

During his argument to the jury the prosecutor repeatedly emphasized that there was a probability rather than a possibility that Treloar and his codefendant would be paroled from a life sentence sometime after the expiration of seven years and that the paramount duty of the jury was to return a verdict that would protect society, even if that required the sacrifice of the defendants' rights. In this vein the district attorney continually argued that the authorities who determine parole could not be trusted to retain defendants until they were completely rehabilitated, since defendants had been paroled in the past and went on to commit additional crimes.[2]

As another method of discrediting the parole and sentencing practices of the Adult Authority, the prosecutor on numerous occasions argued that because defendants had been convicted of kidnaping for the purpose of robbery, for which the punishment is a life term, the jury would be giving defendants a ''free murder'' if it fixed the penalty at life for the shooting of Rivard.[3] He also urged the jury to impose the death penalty for the reason that the Legislature might

---

[2]By way of emphasizing the danger that Treloar might be paroled prior to his complete rehabilitation, the prosecutor argued: ''Is there anything in that past performance record that indicates that you as the judges, that you as the judges feel that he will be [rehabilitated], or in probability, not possibility, I don't want to stake my life on a possibility, I don't want to stake your life on a possibility, I don't want to stake the lives of your neighbors, of your friends, of the people of this community, state or country on the possibilities or probabilities.''

At another point he stated: ''The Adult Authority does its best, but it released the defendant. . . . Am I a little bit unfair in that I say you can't—it isn't a question of not trusting them. They turned him out. Why they did it, I don't know. . . . They are doing the best they can, but why did they turn him loose . . . ?

Earlier in the argument the district attorney had remarked: ''. . . they do the very best they know how, the people that work in there, sociologists, psychologists, psychiatrists, vocational guidance, they do the very best they can. . . . The very best judgment that they had, he [Treloar] should be [paroled]. There was a gamble. . . . We, the people of the state, are asked to gamble our lives that the defendant would not be a menace to society.''

[3]The statement on one occasion was: ''If you in your judgment determine that the sentence shall be life, then that life merges with the life on the others [including the robbery convictions, each carrying a sentence of five years to life] and becomes one life, as I have indicated here, and he is still eligible for parole at the end of seven years. . . . [T]he death that he brought upon Rivard is for free because right now he has this. What then will you contribute by way of penalty to him?''

change the law so that defendant might be paroled in less than seven years.[4]

In addition the jury was instructed by the court that in exercising its discretion in choosing the penalty it was to consider that ''a defendant sentenced either to death or life imprisonment may be pardoned or have his sentence reduced by the governor, and that a prisoner serving a life sentence may be eligible for parole but not until he has served at least seven years.'' The courts also focused attention on the possibility of defendants' early release from a life term by instructing that ''the Legislature may pass a law or laws which, when approved by the Governor, may reduce the penalties for murder or kidnaping for purposes of robbery or both offenses and provide that such law or laws be effective for prisoners already serving life sentences for these offenses.''

■ The prosecutor's questions on *voir dire*, his arguments to the jury, and the above instructions to the jury constituted error in that they tended to invite that body to impose the death penalty in order to prevent the Adult Authority from mistakenly paroling defendant while he remained a danger to society. (See *People* v. *Morse, supra,* 60 Cal.2d 631, 643-644.) The district attorney also improperly discredited the Adult Authority by arguing that a life sentence for the murder would not increase defendant's punishment since he already was subject to a life term as the result of the kidnapings and the robberies, when it is clear that the sentencing authority would consider a first degree murder as a factor toward increase of the length of the total prison term. The argument and instruction that the Legislature might alter the law so that defendant might be paroled in *less than* seven years constituted error even more serious than that involved in *Morse.* (*People* v. *Terry, ante,* pp. 137, 142 [37 Cal.Rptr. 605, 390 P.2d 381].)

Moreover, aside from the affirmative errors which are now revealed in the light of the *Morse* decision, defendant did not have the benefit of the instruction proposed in *Morse* which removes from the jury's consideration the possibility of

---

[4]The deputy argued: ''[T]he Legislature may change the law concerning penalty, fix the penalty for murder in the first degree at less than life, or fix the law so that an individual may be paroled in less than seven years and make it retroactive, that is, make it apply to those then in prison serving life sentences, and I am not reaching up into thin air for that, ladies and gentlemen. It has happened. It is in the statute books.''

premature parole and compels the penalty jurors to assume that the defendant will not be released unless completely rehabilitated. As stated in the *Morse* case, ''[W]e recognize that individual jurors often entertain some ideas of parole laws and might erroneously consider the effect of such laws upon a term of life imprisonment.'' Concerning that problem we held: ''To avoid such unanswered queries and to prevent latent misconceptions, we believe the trial court, at the time of rendition of all instructions, should inform the jury in general terms that life imprisonment can result in parole but that such matters are of no concern to it.'' (60 Cal.2d at p. 647.) The instruction set out in *People* v. *Morse* (60 Cal.2d at pp. 647-648) should preclude imposition of the death penalty by juries out of ignorance of the existence, function, and effectiveness of the Adult Authority.

A new trial as to the penalty imposed on defendant is required because of the enumerated substantial errors affecting that determination. (*People* v. *Arguello, ante,* pp. 210, 215, [37 Cal.Rptr. 601, 390 P.2d 377] ; *People* v. *Hines, ante,* pp. 164, 169-170 [37 Cal.Rptr. 622, 390 P.2d 398].)

The judgment of guilt is affirmed as to all counts. The judgment imposing the penalty is reversed.

Gibson, C. J., Traynor, J., Peters, J., and Tobriner, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment in its entirety.   (See *People* v. *Hines, ante,* pp. 164, 182 [37 Cal. Rptr. 622, 390 P.2d 398] ; *In re Jackson, ante,* pp. 500, 508 [39 Cal.Rptr. 220, 393 P.2d 420].)