[Crim. Nos. 7050, 7718. In Bank. Aug. 31, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN LAW-
RENCE WELCH, Defendant and Appellant.

Alvin H. Goldstein, Jr., and Goldstein, Kopp & Skinner for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Albert W. Harris, Jr., and Michael J. Phelan, Deputy Attorneys General, for Plaintiff and Respondent.

SCHAUER, J.—This matter is before us on an order to show cause issued on a petition for writ of error *coram vobis* to vacate a judgment of conviction entered upon defendant's plea of guilty to two counts of first degree murder and one count of first degree robbery. Defendant also prays leave to reinstate his original pleas of not guilty by reason of insanity. On the murder counts, the trial court sitting without a jury fixed the penalty at death, and we unanimously affirmed the judgment. (*People* v. *Welch* (1962) [Crim. No. 7050] 58 Cal. 2d 271 [23 Cal.Rptr. 363, 373 P.2d 427].) On application by defendant, we stayed execution pending final determination of the present proceedings.

After analyzing the petition's allegations of timeliness and newly discovered fact in the light of the established law of this state we have concluded that defendant meets the strict requirements for issuance of the extraordinary writ of *coram vobis* and that the petition should be granted and the cause remanded to the superior court for further proceedings as hereinafter specified.

Defendant worked as a handyman at a motel in San Bernardino County. During the morning of August 9, 1961, while performing his tasks around the motel, he drank slightly more than 3 quarts of beer. Having previously decided to leave California and return to his home in Michigan, he entered the owner's apartment to see what he could steal to finance his trip and found a revolver. When the owner drove up, defendant left unobserved and went around the motel to a bar. After ordering a glass of beer and drinking half of it, defendant went to the back of the bar, then into the men's restroom. When he emerged, defendant drew the gun from under his shirt and pointed it at the barmaid and the only customer, telling them it was a stick-up. He took all the bills and large change from the cash register, emptied two metal cash boxes found under the counter, and dumped the barmaid's purse in search for more money. Defendant demanded that the customer hand over his money, and the latter pushed some change on the counter, saying it was all he had. Defendant then shot him in the head, killing him. Defendant's version was that the customer seemed to be coming toward him, and that as he was "getting out of the way," defendant "heard the gun go off." The physical evidence showed that the fatal bullet was fired from a distance of 6 to 9 inches and entered not the front but the side of the customer's head while the victim was facing forward across the bar. De-

fendant observed the barmaid "sliding off the freezer" where she was sitting. He turned his gun on her and fired once; the bullet entered the side of her head, killing her instantly. Defendant took the dead customer's wallet, then left the bar, crawled through a fence, and drove away in his employer's pickup truck. When the truck developed engine trouble and eventually stopped, defendant abandoned the vehicle and began hitchhiking. Late that night, he was arrested outside Las Vegas.

The present petition for writ of error *coram vobis* alleges that at the age of 5 defendant suffered an attack of encephalitis with resulting brain damage, and that such brain damage continued to exist at the time of the murders. It is further alleged that neither defendant nor his counsel knew of these facts, and accordingly did not present them to the court, when defendant withdrew his pleas of not guilty and not guilty by reason of insanity and entered pleas of guilty to the two counts of murder and one count of robbery (November 6, 1961), when the issue of penalty was tried to the court (November 6 to 9, 1961), and when the court denied a motion to reduce the penalty and pronounced judgment of death (November 16, 1961).

Attached to the petition are several declarations and affidavits. The declaration of Dr. Donald Bramwell, a psychiatrist and Superintendent of Sonoma State Hospital, states that on December 3, 1963, he interviewed defendant in prison and examined his psychiatric report and files; that clinical records of the Wayne County Training School, Michigan, show that at the age of 5 defendant suffered an acute case of encephalitis that resulted in brain damage, and that he thereafter exhibited signs of mental retardation associated with postencephalitic syndrome; that electroencephalographic examinations conducted on defendant at San Quentin in January and October 1962 revealed brain damage in the left hemispheric and left frontal areas; that defendant's prior violations of the law (e.g., car thefts and burglaries) occurred after he had consumed alcoholic beverages, that defendant's reactions to such beverages "indicate to me that he experienced episodes of automatic behaviour when drinking followed by amnesia," and that defendant's record of good conduct in penal institutions "confirms my general impression that it is consumption of alcohol which precipitates violent conduct of this individual due to irritation of scar tissue in the left hemispheric region (the dominant area) of Welch's brain."

On the basis of the foregoing records, Dr. Bramwell concludes that "a person possessing Welch's history, as set forth above, and with a postencephalitic syndrome of the nature revealed by the electro-encephalogram examinations at San Quentin State Prison, who consumes over three quarts of beer within a period of three hours could be expected to be in a mental state in which his behaviour would be automatic and for which he would be unable to recognize or understand the nature and consequences of his act and for which he could not be said to be responsible." Dr. Bramwell further defines such "automatic behaviour" as "compulsive actions inconsistent with the usual behaviour patterns of the individual and during which the individual is unaware of the nature or consequences of his conduct and for which he later has little or no recollection." In Dr. Bramwell's opinion, defendant "did not understand the nature and quality of his acts and was not responsible for his conduct at the time" of the crimes.

A declaration by Charles Ward, the public defender who represented defendant at the trial, states that he was unaware of defendant's medical history until informed of it by defendant's present attorney on November 8, 1963; that if he had known of such history at the time of trial, he would have advised defendant against withdrawing his pleas of not guilty and not guilty by reason of insanity and at the penalty hearing would not have stipulated to the admission of a report by Dr. Otto Gericke that contained, *inter alia,* the statement that defendant had had "the usual childhood diseases."

■ The long-settled and controlling law in this type of proceeding was recently restated by us as follows: "The writ of *coram vobis* is essentially identical to the writ of *coram nobis* except that the latter is addressed to the court in which the petitioner was convicted. (*In re Lindley* (1947) 29 Cal.2d 709, 726 [177 P.2d 918].) ■ These writs will be granted only if petitioner can 'show that some fact existed which, without any fault or negligence on his part, was not presented to the court at the trial on the merits, and which if presented would have prevented the judgment.' (*People* v. *Mendez* (1946) 28 Cal.2d 686, 688 [171 P.2d 425]; accord, *People* v. *Reid* (1924) 195 Cal. 249, 255 [232 P. 457, 36 A.L.R. 1435]; *In re Lindley* (1947) *supra,* at pp. 724-726; *People* v. *Tuthill* (1948) 32 Cal.2d 819, 821 [198 P.2d 505].)" (*In re Imbler* (1963) 60 Cal.2d 554, 570 [17-18] [35 Cal.Rptr. 293, 387 P.2d 6].)

■ To begin with, "It is well settled that a showing of

diligence is prerequisite to the availability of relief by motion for *coram nobis*. [Citations.] ■ One who applies for a writ of *coram nobis* upon a ground such as the one here presented must show that the facts upon which he relies were not known to him and could not in the exercise of due diligence have been discovered by him at any time substantially earlier than the time of his motion for the writ; otherwise he has stated no ground for relief.'' (*People* v. *Shorts* (1948) 32 Cal.2d 502, 512 [9]-513 [10] [197 P.2d 330]; see generally Note 62 A.L.R.2d 432.) ■ Moreover, the defendant must also set forth the probative facts constituting the asserted justification of his failure to present the matter in timely fashion, ''in order that the court can determine as a matter of law whether the litigant proceeded with due diligence; a mere allegation of the ultimate facts, or of the legal conclusion of diligence, is insufficient.'' (*People* v. *Shorts* (1948) *supra,* 32 Cal.2d 502, 513 [12].)

■ In the case at bench defendant did not know the facts related in his petition at the time of trial.[1] He was aware that he had been ill as a child, but did not realize the nature or significance of his childhood illness until after his conviction. Defendant has repeatedly been diagnosed as mentally retarded and has an I.Q. of only 67 to 88. The record shows that defendant told Dr. Gericke, a doctor who interviewed him before his trial and with whom he ''spoke freely and was cooperative,'' that his medical history included only ''the usual childhood diseases'' and an appendectomy. In the circumstances neither he nor his trial counsel could reasonably have been expected to inquire further about his mental condition, for there was no indication whatever of past or present mental aberrations. Dr. Gericke reported that defendant had never been in a hospital for the mentally ill, that he ''gets along with people,'' that he had no delusional ideas or hallucinatory experiences, that his mood was normal, and that in the doctor's opinion he was legally sane.

Nor did defendant fail to exercise due diligence in presenting these facts to a court after their discovery. In January 1962, two months after judgment of conviction was pronounced, electroencephalographic examinations of defendant were conducted at San Quentin, establishing the fact of brain

---

[1]This lack of personal knowledge on defendant's part distinguishes the present case from *People* v. *Cabrera* (1936) 7 Cal.2d 11, 12-13 [1] [59 P.2d 804].

damage in the left hemispheric and left frontal areas. In October 1962, further electroencephalographic examinations were conducted at San Quentin that confirmed these tests. Sometime in 1962, defendant learned of the results of these examinations and made inquiries about his mental history.

In November 1962, the Wayne County Training School responded to defendant's inquiry, informing him that "it is true that adjustment has been difficult for you since the age of five years, when you suffered an attack of encephalitis. Our psychiatrist made the following diagnosis: post encephalitic personality deviation. Prognosis was poor." The letter further states, "Many of our old records are now on microfilm, and we are unable to make copies of them. . . . In reply to your question, Mr. and Mrs. Fred S. Webb are no longer employed at the Training School. The former Medical Superintendent, Dr. Haskell, retired in 1955." Despite this partial rebuff, defendant apparently inquired further of the school. In June 1963 he received a notarized letter from the present medical superintendent of the school, quoting unfavorable psychiatric evaluations of defendant from the school's clinical records and stating that his complete microfilmed clinical record was on file and available for inspection on demand.

Meanwhile, in February 1963, defendant had received an "affidavit" from his father, describing in detail defendant's childhood illness and its subsequent history. Defendant was informed that "you had sleeping sickness when you were 5 years old, and it affected some of your brain cells"; that a doctor who examined him stated that "you may or may not become permanently affected by the illness in later years"; that "due to your mental condition you could not advance any further than the 4th grade"; that he was then placed in a special school "for children in your condition"; and that at the age of 13, he was placed in the Wayne County Training School.

During this period, defendant had no attorney. Sometime after June 1963, he sought assistance from the San Francisco Theological Seminary, and some months later, defendant's present counsel was asked to represent him. His counsel avers: "The microfilm clinical record of the Wayne County Training School . . . was received by me at my office in San Francisco, California, on November 27, 1963, and was remailed on that date, by certified mail, return receipt requested to Donald M. Bramwell, M.D., . . . who received said record

on December 2, 1963. This was the first occasion said record was physically available for study in the State of California. . . ." On December 3, 1963, Dr. Bramwell reviewed defendant's psychiatric record at San Quentin and interviewed defendant. On January 28, 1964, the present petition for the writ of error *coram vobis* was filed in this court with the above described document.

We cannot say that defendant failed to exercise due diligence. Although he first became aware of his brain damage more than a year before his petition was filed, defendant spent the intervening period bolstering his case, filling the gaps in his medical history, and securing assistance. We recognize his difficulty in establishing facts such as those at issue here while imprisoned in San Quentin. Promptly after securing a psychiatric evaluation of such facts, defendant instituted this proceeding.

Turning now to the substantive allegations of the petition, we have frequently repeated that in this state "The grounds upon which a writ of error *coram nobis* may be granted are strictly limited." (*People* v. *Shorts* (1948) *supra,* 32 Cal.2d 502, 516 [14] ; see detailed discussion of cognizable grounds in *People* v. *Reid* (1924) *supra,* 195 Cal. 249, 254 [1]- 260 [7].)

■ As we pointed out in *People* v. *Tuthill* (1948) *supra,* 32 Cal.2d 819, 822 [2], "It is a general rule that the writ will not be granted for newly discovered evidence going to the merits of the issues tried; issues of fact, once adjudicated, even though incorrectly, cannot be reopened except on motion for new trial. (*In re Lindley* (1947) 29 Cal.2d 709, 725 [177 P.2d 918] ; *People* v. *Paysen* (1932) 123 Cal.App. 396, 402 [11 P.2d 431] ; *People* v. *Vernon* (1935) 9 Cal.App.2d 138, 146 [49 P.2d 326] ; *People* v. *Cox* (1936) 18 Cal.App.2d 283, 286 [63 P.2d 849] ; *People* v. *Hanks* (1939) 35 Cal.App. 2d 290, 300 [95 P.2d 478].)" ■ It is likewise settled that this rule applies even though the subject evidence is not discovered until after the time for moving for a new trial has elapsed or the motion has been denied (see, e.g., *People* v. *Reid* (1924) *supra,* 95 Cal. 249, 257 [3]-258 [6] ; *People* v. *Mooney* (1918) 178 Cal. 525, 529-530 [174 P. 325] ; *People* v. *Snebold* (1961) 191 Cal.App.2d 514 [1] [12 Cal.Rptr. 827] ; *People* v. *Cox* (1936) *supra,* 18 Cal.App.2d 283, 286 [2] ; *People* v. *Paysen* (1932) *supra,* 123 Cal.App. 396, 403 [9]), the reason being that "Where the legislature has provided a statutory remedy which supplants in whole or in part a corresponding common-law remedy and has appended thereto a

statute of limitations different from that which governs the common-law remedy, there is presented the situation of a conflict between the common law and the statute, in which case the latter must prevail. To hold in such case that after the expiration of the statutory limit the common-law remedy could still be availed of would be to hold in effect that in case of conflict between the two the common law prevails over the statute.'' (*People* v. *Reid* (1924) *supra,* 195 Cal. 249, 257-258 [5].)

 Here, however, we are not dealing with newly discovered evidence ''going to the merits of the issues tried'' or ''issues of fact, once adjudicated'' (*People* v. *Tuthill* (1948) *supra,* 32 Cal.2d 819, 822 [2]); rather, the petition presents facts essential to an informed determination of a material issue which, through no fault of defendant, has never yet been tried and adjudicated—i.e., the question of defendant's legal sanity at the time of the commission of the crimes. In the above cited cases denying applications for *coram nobis* or *coram vobis* on the ground of newly discovered evidence, such evidence related only to matters that had been expressly adjudicated at the trial or at least had been put in issue by the accusatory pleading and the defendant's general plea of not guilty. As to those matters the defendant has had his day in court, and considerations of public policy dictate that he be barred from relitigating them after exhausting (or failing to invoke) his statutory remedies of motion for new trial and appeal. (*People* v. *Reid* (1924) *supra,* 195 Cal. 249, 257 [4]-258 [5].) But such policy considerations are outweighed by the interest in individual fairness and justice in a case where, as here, the defendant through no fault of his own was unaware at the time of trial of the existence of such potentially crucial facts as his substantial postencephalitic brain damage. The question of defendant's legal sanity at the time of the crimes, of course, was not expressly adjudicated in this trial; nor was it even put in issue, for in California, by statute (Pen Code, § 1016), a defendant accused of crime is deemed to admit his legal sanity unless he interposes the plea of not guilty by reason of insanity and at the appropriate time offers evidence in support of such plea.

We do not hold that, merely because of the existence of the writ of *coram vobis,* a defendant may with impunity fail to prepare his entire case to the best of his—and his counsel's—ability and diligence; nor that such relief will be granted without an adequate showing of *facts* sufficient to bring the

case within the strictly limited rules hereinabove set forth (see, e.g., *People* v. *Tuthill* (1948) *supra,* 32 Cal.2d 819, 821 [1]-822 [3]; *People* v. *Shorts* (1948) *supra,* 32 Cal.2d 502, 512 [9]-516 [14]). In the present case, however, those strict requirements have been met.

The writ of error *coram vobis* is granted. The remittitur issued in *People* v. *Welch* [Crim. No. 7050] 58 Cal.2d 271 [23 Cal.Rptr. 363, 373 P.2d 427] is recalled; the judgment of conviction is vacated; defendant's pleas of not guilty by reason of insanity are reinstated; and the case is remanded to the Superior Court of San Bernardino County for further proceedings.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.