[Crim. No. 8624. In Bank. Apr. 5, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WALTER
CLAYTON HINES, Defendant and Appellant.

Walter Clayton Hines, in pro. per., Burton Marks and Harold J. Ackerman, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

BURKE, J.—Defendant pleaded guilty to first degree murder, and a jury fixed the penalty at death. On appeal the judgment was reversed insofar as it related to the penalty but affirmed in all other respects. (*People* v. *Hines,* 61 Cal.2d 164 [37 Cal.Rptr. 622, 390 P.2d 398].) At the second penalty trial a jury again imposed the death penalty. Motions for a new trial and for reduction of penalty were denied, and defendant's second automatic appeal is now before us (Pen. Code, § 1239, subd. (b)).

About midnight on July 1, 1962, the body of Billy Cooper was found behind the counter of Mary's liquor store, where he had worked, on Lincoln Boulevard in Venice. An autopsy revealed that death was caused by multiple gunshot wounds, the major ones being in the head and heart. The bullets removed from the body were .32 caliber.

The police found one .32 automatic cartridge case on the customer's side of the counter and four such cases on the other side of the counter. A .22 revolver was by the body. No .22 caliber slugs were found in the store but in the store ceiling the police saw what appeared to be bullet holes of a .22 caliber projectile.

The police had but few clues, had no idea that defendant was involved in the killing, and so, of course, were not looking for him. Although a description of the killer was secured and published, this description only vaguely resembled defendant.

About 2:15 p.m. on July 11, 1962, defendant walked into the Venice police substation. The desk officer took him into the

office of Officer Hestand and said, "This man just came to the desk next door and he put the gun and a sack of ammunition on the desk, and he said, 'Are you looking for the man that killed the clerk in the liquor store on Lincoln Boulevard a couple of weeks ago?', then he said, 'Here's the gun, and I am the one that did it.'" Officer Hestand and three other officers thereupon talked with defendant for 55 minutes,[1] and the conversation was tape-recorded.

At the outset of the conversation Hestand told defendant to "start from the bottom." Defendant said he "killed the guy, and that is all." Hestand asked him whom he had killed, and defendant said the victim was a liquor store attendant but he did not know the man's name. In response to questions as to the location of the store and its name, defendant said it was on Lincoln Boulevard and was named "Mary's." Hestand then asked for the circumstances of the killing. Defendant said that he lived near Mary's, so it was a "logical place to hit"; that he went into the store, asked for a pack of cigarettes, pulled out his gun, and said "this is a stick-up"; that he saw the attendant start to push a button which would notify the police; that after defendant told him not to push the button, the attendant pulled out a gun and fired; that defendant thought he was hit and shot at the clerk who fell; and that defendant then "reached over the counter and shot [the victim] some more."

In response to ensuing questions by Hestand, defendant stated that he did not know who fired first, that his first shot hit the decedent in the temple over the right eye and another wound was in his chest (such wounds are shown by the autopsy report), and that the killing occurred either at 11:30 or 12:30 at night "a week ago last Sunday" (which was the night of the killing).

Hestand then inquired where defendant got the gun, and why he selected Mary's to rob. Defendant said he bought the gun, and robbed Mary's because he did not have a car and the store was near his home. Hestand asked if he had ever had an argument with decedent, and defendant said no, denied knowing decedent's name, stated that he killed to prevent identi-

---

[1]The transcript discloses the following during the examination of Officer Hestand: "Q. When and where did you have your first such conversation [with defendant regarding Billy Cooper's death]? A. It was on July the 11th, 1962 at the Venice Detective Bureau ... at about 2:30 in the afternoon. Q. Who else was present at that time? A. Sergeant Dahl, Sergeant Murphy and Officer Silvers, and I believe that was all."

fication, and that he felt sorry for the attendant. He also said that he intended to kill the clerk after taking money from him, that the attendant's shooting at him "threw me off," and that he did not take any money, but only a pack of cigarettes. When asked what ammunition he used, he replied "thirty-two automatic."

Further questioning dealt with details relating to the crime and information as to defendant's background. He was asked, among other things, if he had ever been in a mental institution, whether he had any "mental trouble," whether he had read about the crime in a newspaper, and why he was seeing a named doctor whose card was in defendant's wallet. At one point when asked if he felt remorseful, defendant replied, "Well, I don't know. I can't say that I am sorry that I killed the guy, you know, because I wanted to kill him, you know, and I had planned to kill him." At another point, when asked about the gun battle, defendant said, "I thought that dirty son of a bitch, I will get him, you know." At the conclusion of the conversation one of the officers asked, "Do you think we ought to get him over and get him booked?," and another officer replied, "Okay."

Defendant took the stand in his own behalf at the instant penalty trial and testified to the following effect: On the night of the crime he went to the liquor store to rob and murder whoever was there but after entering the store and talking to the clerk he realized he "couldn't shoot him just like that." He thinks that he and the decedent shot simultaneously. He expressed remorse for having killed the decedent and stated that he committed the murder because he had a suicidal impulse to be executed by the state.

 Defendant contends that the trial court erred in admitting his tape-recorded confession over his objection based on *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal. Rptr. 169, 398 P.2d 361].[2] We do not agree.

[2]Defendant makes no claim that the trial court failed to examine the taped confession in the light of *Dorado.* The dissent assumes the trial court failed to do so. Even if this assumption were correct, such failure would not be prejudicial error because the tape was properly admitted. Furthermore, the assumption is not warranted by the record. The record shows: When the judge overruled the objection to the tape, he did not state the reason for his ruling. After the tape had been played, defendant moved to strike it, and the court stated, "The motion is denied. It should be remembered that we are here concerned with penalty. The matter of the use of these confessions or admissions establishing guilt has already been determined. They are left in for the limited purpose of the issue here involved." Although this comment could be viewed as indicating

The instant penalty retrial was after the decision was rendered in *Escobedo* v. *Illinois, supra,* 378 U.S. 478, but before the decision in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. The principles enunciated in *Escobedo* and *People* v. *Dorado, supra,* 62 Cal.2d 338, but not those in *Miranda* are therefore applicable here. (*Johnson* v. *New Jersey,* 384 U.S. 719 [16 L.Ed.2d 882, 86 S.Ct. 1772]; *People* v. *Rollins,* 65 Cal.2d 681 [56 Cal. Rptr. 293, 423 P.2d 221].)

The police had no evidence connecting defendant with the crime when he voluntarily walked into the police station, admitted the killing, and produced a gun that he claimed was the murder weapon. At that time there thus appeared to be a substantial possibility that he was a mentally disturbed person or a fraud falsely confessing to the crime. It is a matter of common knowledge that many such persons have confessed to crimes which investigation develops could not have been committed by them. In the unsolved so-called "Black Dahlia" case in Los Angeles County the number of such persons ran into several hundred. In the present case the object of the 55-minute conversation clearly was not to elicit a confession but to eliminate the possibility that defendant was a mentally disturbed person or a fraud. Accordingly, there was absent one of the conditions essential to render the conversation inadmissible under *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and *People* v. *Dorado, supra,* 62 Cal.2d 338.

It is true that early in the conversation defendant showed considerable familiarity with the details of the crime, such as the date and place of the killing, the fact the attendant had a gun, roughly the number of times he was shot, and the location of the wounds, but such knowledge could have been obtained from a source such as a newspaper or the actual killer, and it would not have been unreasonable for the police still to have believed that there was a substantial possibility that defendant was a mentally disturbed person or fraud. An indication that the police retained that belief after defendant

the judge did not think *Dorado* applied to a penalty trial, the comment did not show that he denied the motion to strike, or had previously overruled the objection, solely on that ground. Thereafter, at the hearing on defendant's motion for a new trial, which apparently was based in part on asserted error in admitting the tape, the judge raised the question whether *Dorado* applied to a penalty trial and then heard arguments directed both to that issue and to the issue whether the accusatory stage had been reached. When the judge denied the motion, he did not state the reason for his ruling.

showed his familiarity with the crime appears from their asking him questions such as whether he had ever been in a mental institution and why he was seeing the doctor whose card was in his wallet. It is apparent that in the present case the officers were not engaging in tactics of the type that in the past have spawned involuntary confessions, the evil *Escobedo* sought primarily to prevent (*In re Lopez*, 62 Cal.2d 368, 372-373 [42 Cal.Rptr. 188, 398 P.2d 380]) but rather were seeking to ascertain whether defendant's voluntary confession was untrue.

As this court pointed out in *People* v. *Cotter*, 63 Cal.2d 386, 393, 396 [46 Cal.Rptr. 622, 405 P.2d 862] (vacated on another ground in 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 824]), *Escobedo* and *Dorado* ''were aimed at restraining law enforcement officers, once the accusatory stage has been reached, from the use of inquisitorial techniques in seeking to prove the charge against the accused out of his own mouth. They were never intended to discourage a defendant from volunteering to the police his complicity in the perpetration of a crime nor to prohibit the police from receiving and acting upon such confessions. . . . Neither this court, nor the United States Supreme Court, has ever taken the position that the desire of a guilty man to confess his crime should be stifled, impeded, discouraged, or hindered in any way. The contrary is true.''

 A confession written by a stenotypist and signed by defendant after 4 p.m. on July 11, 1962, at the Los Angeles police headquarters where he was taken following the tape-recorded conversation was admitted over an objection based on *Escobedo* and *Dorado,* and defendant urges that the admission of his written confession was prejudicial error. This court has held that any substantial error at a penalty trial must be deemed to be prejudicial (*People* v. *Hines, supra,* 61 Cal.2d 164, 169-170), but any error in admitting defendant's written confession was not substantial error because that confession contained essentially the same matters appearing in his prior taped confession. (*People* v. *Jacobson*, 63 Cal.2d 319, 331-332 [46 Cal.Rptr. 515, 405 P.2d 555] [cert. den. 384 U.S. 1015 [16 L.Ed.2d 1036, 86 S.Ct. 1954]] (erroneous admission of confessions at guilt and penalty trial held nonprejudicial because they were merely cumulative).) We likewise believe beyond a reasonable doubt that any error in admitting the written confession was harmless. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

■ Defendant also contends that the trial court erred in refusing to give a requested instruction concerning *Dorado*. Apart from the fact that *Dorado* presents a question of admissibility for the judge (see *Jackson* v. *Denno*, 378 U.S. 368, 386, fn. 13 [12 L.Ed.2d 908, 921, 84 S.Ct. 1774, 1 A.L.R.3d 1205]), the instruction did not correctly state the law because it told the jury to disregard extrajudicial statements made by defendant if he was not previously advised of his constitutional rights, without mentioning that the rule applies only after the accusatory stage has been reached.

■ There is no merit in defendant's contention that the trial court erred in permitting, over his objection, psychiatric testimony to the effect that defendant might kill again under similar circumstances. Such evidence related to defendant's mental condition and was admissible. (*People* v. *Hines, supra,* 61 Cal.2d 164, 173.) ■ Equally without merit is the claim that the prosecutor committed error in arguing to the jury along the same line. If the evidence on this matter was admissible, so was the argument.

Also without merit is defendant's contention that we should disapprove the instruction proposed in *People* v. *Morse*, 60 Cal.2d 631, 648 [36 Cal.Rptr. 201, 388 P.2d 33]. (See *People* v. *Jacobson, supra,* 63 Cal.2d 319, 332-333.)

Defendant's next claim of error involves a challenge of the trial court judge. On October 8, 1964, the cause was called before Judge Rhodes. On that day the prosecutor moved to continue the matter until the 14th, so that the court could read the transcript of the prior penalty trial and decide from that whether it would set aside a death penalty verdict should the jury bring one in. If so, the prosecutor stated, it would be "a waste of the taxpayer's money" to have "a full-scale trial." On the other hand, if the court felt that it might uphold the death penalty, the trial would take place as planned. Defense counsel agreed to this, asking the court also to read certain psychiatric reports and to consider the fact that defendant would testify in the second trial, whereas he had not testified at the first. The court agreed to do so.

On October 14, the trial judge informed defense counsel that on the basis of what he had read he would not set aside a death penalty verdict were one rendered. Defense counsel then filed an "affidavit of disqualification" in which he alleged that he believed that Judge Rhodes was prejudiced against defendant and that defendant could not have a fair and impartial trial before him. At a hearing on October 15, the court denied

356

the challenge and stated that the court "is impartial, un-biased, and that there exists no reason in fact why the defend-ant may not have a fair and impartial trial before this Court."

Considered as a peremptory challenge made under section 170.6 of the Code of Civil Procedure, defendant's challenge was properly denied, for it was filed too late. We recognized in *McClenny* v. *Superior Court* (1964) 60 Cal.2d 677, 683 [36 Cal.Rptr. 459, 388 P.2d 691], that "a section 170.6 motion comes too late when filed after the judge has decided prelim-inary contested matters." (See also *Swartzman* v. *Superior Court* (1964) 231 Cal.App.2d 195, 200 [41 Cal.Rptr. 721], and *Michaels* v. *Superior Court*, 184 Cal.App.2d 820, 824-827 [7 Cal.Rptr. 858].)[3] As stated in *Jacobs* v. *Superior Court* (1959) 53 Cal.2d 187, 191 [1 Cal.Rptr. 9, 347 P.2d 9], if the rule were otherwise, litigants could "gamble on obtaining a favorable decision from one judge, and then, if confronted with an adverse judgment, . . . disqualify him without pre-senting facts showing prejudice, in the hope of securing a different ruling from another judge in . . . proceedings in-volving substantially the same issues." ■ Here defend-ant filed his affidavit only after learning that the judge was not going to favor him on a matter which defendant agreed to submit to him. It was then too late to have the judge disquali-fied under section 170.6.

■ Defendant urges that by reading the transcript and medical reports, the trial judge "prejudged" an issue he would be required to pass upon at trial (if and when the jury returned a verdict of death) and was therefore no longer impartial and should have disqualified himself. This argument cannot be accepted. Judges frequently pass upon pretrial mo-tions, such as demurrers and motions to dismiss, which in-

[3]In 1965 section 170.6 was amended by the addition of a provision that "The fact that a judge has presided at or acted in connection with a pretrial conference or other hearing, proceeding or motion prior to trial and not involving a determination of contested fact issues relating to the merits shall not preclude the later making of the motion provided for herein at the time and in the manner hereinbefore provided." This provision was not in effect when the trial court ruled on defendant's challenge in the instant case but was later enacted while his automatic appeal was pending. Section 3 of the Code of Civil Procedure provides, "No part of it is retroactive, unless expressly so declared." (See *Barry* v. *Barry*, 124 Cal.App.2d 107, 111-113 [268 P.2d 147].) Furthermore, had the provision been in effect when the trial court ruled on defendant's challenge, it would not have aided him because the trial judge's decision that on the basis of what he had read he would not set aside a death penalty verdict clearly involved "a determination of contested fact issues relating to the merits."

volve issues they may have to again pass upon later in the trial, as upon a motion for nonsuit or directed verdict, and a judge who passes on a pretrial motion obviously need not disqualify himself from further participation in the case.

■ There is no merit in defendant's claim that the trial court erred by denying his motion to withdraw his plea of guilty. The motion was predicated on the ground that defense counsel at the time he advised defendant to enter the guilty plea believed defendant's confessions were admissible in evidence and defendant had no defense and that subsequent changes in the law (*Escobedo* and *Dorado*) assertedly made those confessions inadmissible. As already pointed out, the tape-recorded confession was clearly admissible, and that confession admits guilt of murder in the first degree. There is no reason to believe that counsel would have advised defendant differently from the way he did had he realized that this confession was admissible but that a subsequent one might not be admissible.

Defendant filed with this court a petition in which he seeks leave to withdraw his guilty plea, or in the alternative the appointment of a referee to take testimony to determine whether his guilty plea was voluntary.[4] According to the petition, he pleaded guilty, in accordance with the advice of the public defender who represented him, because the public defender told him that if he did not plead guilty he would receive the death penalty, that if he pleaded guilty he would be given a life sentence, and that "the prosecuting officials," with whom the public defender had talked, would accept a guilty plea and "recommend a sentence of life imprisonment."

■ Mere advice or assurance by defense counsel will not vitiate a plea entered in reliance thereon. (*In re Teran,* 65 Cal.2d 523, 528 [55 Cal.Rptr. 259, 421 P.2d 107]; *People* v. *Reeves,* 64 Cal.2d 766, 776 [51 Cal.Rptr. 691, 415 P.2d 35]; *In re Atchley,* 48 Cal.2d 408, 418 [310 P.2d 15]; *People* v. *Toth,* 224 Cal.App.2d 130, 132 [36 Cal.Rptr. 417].) Although representations by defense counsel as to a purported commitment as to penalty from a responsible state official, if the acts of such state official apparently corroborate the representation,

---

[4]Defendant also requests that a referee be appointed to determine whether he was "afforded the aid of competent counsel" and whether his confessions were voluntary, but he has not alleged any facts from which it appears his attorney was incompetent or his confessions involuntary.

where relied upon by defendant in good faith may constitute justification for permitting a withdrawal of a guilty plea (*People* v. *Gilbert,* 25 Cal.2d 422, 443 [154 P.2d 657]; see *People* v. *Jones,* 52 Cal.2d 636, 650 [343 P.2d 577]), defendant's allegations do not show that this is such a case. ▮ Moreover, defendant has not alleged facts showing that he acted with due diligence in seeking to withdraw his guilty plea on the grounds now urged. (See *In re Watkins,* 64 Cal.2d 866, 870-872 [51 Cal.Rptr. 917, 415 P.2d 805]; *People* v. *Welch,* 61 Cal.2d 786, 790-791 [40 Cal.Rptr. 238, 394 P.2d 926]; *People* v. *Quigley,* 222 Cal.App.2d 694, 700 [35 Cal. Rptr. 393].) Defendant states that he has been "emotionally disturbed" but has not otherwise explained his apparent delay of nearly four years, during which two penalty trials have been conducted, in making the instant claim.

The petition for permission to withdraw the guilty plea or for the appointment of a referee is denied, and the judgment is affirmed.

Traynor, C. J., McComb, J., Tobriner, J., Sullivan, J., and Roth, J. pro tem.,* concurred.

PETERS, J.—I dissent.

The majority ignore the factfinding obligation of the trial court to determine when, during a police interrogation, the accusatory stage has been reached, erroneously apply the rules announced in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], misinterpret the rules announced in *People* v. *Jacobson,* 63 Cal.2d 319 [46 Cal.Rptr. 515, 405 P.2d 555], and *People* v. *Cotter,* 63 Cal.2d 386 [46 Cal.Rptr. 622, 405 P.2d 862] (judgment vacated by U.S. Supreme Court, 386 U.S. 274 [18 L.Ed.2d 43, 87 S.Ct. 824]), and fail to apply properly the rule that an error, harmless on the guilt trial, may be very prejudicial on the penalty trial. This last stated rule is, in fact, part of the law of this case, having been expressly applied on the prior appeal. (*People* v. *Hines,* 61 Cal.2d 164, 168-170 [37 Cal.Rptr. 622, 390 P.2d 398].) For these many reasons the judgment should be reversed.

The defendant pleaded guilty to first degree murder. On the penalty trial the jury imposed the death penalty. This is

---

*Assigned by the Chairman of the Judicial Council.

an automatic appeal from the judgment entered on that verdict.

At trial two confessions, over objections, were introduced. The first, taken before formal arrest, was taped and played to the jury; the second, taken after arrest, was transcribed and read to the jury. Neither of the warnings required by *Escobedo, supra,* and *Dorado, supra,* was given. There can be no doubt at all, and the majority opinion tacitly agrees, that it was error to admit the transcribed confession.

As to the taped confession the majority opinion is misleading. It states that after defendant arrived at the police station "Officer Hestand and three other officers thereupon talked with defendant for 55 minutes." The record fails to disclose with certainty that the other officers were present during the first part of the interrogation. But the record does disclose that the first part of the interrogation, covering all essentials of the offense, was conducted by Hestand alone. This portion of the confession was clearly admissible as a volunteered statement. But after Hestand apparently became convinced that defendant was not a fraud or sensation seeker the other officers entered into the interrogation. They went back over the entire transaction obviously in an attempt to elicit incriminating statements to be used at the trial. To say the least, this portion of the questioning occurred under such circumstances that the trial court should have determined whether the accusatory stage had been reached. This the trial court refused to do, apparently because it erroneously believed that *Escobedo* and *Dorado, supra,* did not apply to penalty trials.

On the incomplete record before us the evidence indicates that the second half of the taped confession was taken after the accusatory stage had been reached. In my opinion it was error to admit this portion of the taped confession into evidence, over objection. This is important, because it was during this portion of the confession that defendant confessed to shooting the deceased to prevent identification and pursuant to an intent to kill before he entered the store, and referred to the deceased in a derogatory and profane fashion. This portion of the confession may well have influenced the jury to impose the death penalty.

The facts as shown by the record are that about midnight of July 1, 1962, Billy Cooper was found dead behind the counter of Mary's liquor store on Lincoln Boulevard in Venice, California. The autopsy showed that death was caused by gunshot wounds from a .32 caliber gun, the two major wounds being

in the head and heart. Officer Hestand, the investigating officer, found a .22 revolver next to the body, and two small bullet holes in the ceiling. There were several .32 automatic cartridge cases found on the floor on the customers' side of the counter. No .32 caliber pistol was found.

Although a description of the killer had been secured, this description only vaguely resembled the defendant. The police had no idea he was involved and were not looking for him. Under these circumstances the following occurred: Officer Hestand was at the Venice police substation on July 11, 1962. He testified that the desk officer, McClelland, came into his office with defendant and said, "This man just came to the desk next door and he put the gun and a sack of ammunition on the desk, and he said, 'Are you looking for the man that killed the clerk in the liquor store on Lincoln Boulevard a couple of weeks ago?' then he said, 'Here's the gun, and I am the one that did it.' " Hestand then proceeded to question defendant. Their conversation was tape recorded, and the tape was admitted into evidence and played before the jury.

Hestand told defendant to "start from the bottom." Defendant said he "killed the guy, and that is all." Hestand asked him who he had killed, and defendant said he did not know the victim's name, but he was a liquor store attendant. In response to questions as to the location of the store and its name, defendant said it was on Lincoln Boulevard and was named "Mary's." Hestand then asked for the circumstances of the killing. Defendant said that he lived near Mary's, so it was a "logical place to hit"; that he went into the store, asked for a pack of cigarettes, pulled out his gun, and said "this is a stickup"; that he saw the attendant step on a button which would notify the police; that after defendant told him not to push the button, the attendant pulled out a gun and fired; and that defendant thought he was hit and shot back at the clerk who fell behind the counter.

Later in the interview, in response to further questions by Hestand, defendant stated that he did not know who fired first, that he thought the attendant was still alive after falling and shot him three more times, that the first shot hit the decedent in the temple or over the right eye and another wound was in his chest (such wounds are shown by the autopsy report), and that the killing occurred either at 11:30 or 12:30 at night "a week ago last Sunday" (which was in fact the night and approximate time of the killing).

Hestand then inquired about where defendant got the gun,

and why he selected Mary's to rob. Defendant said he bought the gun, and robbed Mary's because he did not have a car and the store was near his home. Hestand asked if he had ever had an argument with decedent, and defendant said no, denied knowing decedent's name, and that he felt sorry for the attendant. He also said, rather ambiguously, that he had intended to kill in any event, that the attendant shooting at him "threw me off," and that he did not take any money, but only a pack of cigarettes.

At this point in the interrogation, Hestand apparently became satisfied that defendant was not a fraud because the other officers then began to question the defendant. Their questions were obviously aimed at securing incriminating evidence for use at the trial. Asked about the gun, defendant said he used a 7.65 Walther automatic, the gun he had brought to the police station. Asked what ammunition he used, he said he used "thirty-two automatic." Asked about what he had planned, defendant stated, this time clearly, that before he entered the store he had planned to kill whoever was behind the counter.

Further questioning continued until 3:10 p.m. (the tape shows that the questioning began at 2:15 p.m.). This dealt primarily with further details of the crime and information as to defendant's background. At one point, when asked if he felt remorseful, defendant replied "Well, I don't know. I can't say that I am sorry that I killed the guy, you know, because I wanted to kill him, you know, and I had planned to kill him." At another point, when asked about the gun battle, defendant said "I thought that dirty son of a bitch, I will get him, you know."

Defendant was then taken to the downtown police headquarters and booked. About 4:30 p.m. he gave another confession which was written down by a stenotypist and signed. This confession contained essentially the same facts contained in the earlier one. The written transcript of this confession was admitted into evidence and made "available for the jury should they desire to read it."

At no time had defendant been advised of his constitutional rights.

At the second penalty trial, defense counsel objected both to the introduction of the tape and the introduction of the transcribed confession, invoking *Escobedo* v. *Illinois, supra,* 378 U.S. 478, and *People* v. *Dorado, supra,* 62 Cal.2d 338. Both objections were overruled.

Neither in response to this objection nor at any other time did the court make any effort to apply the standards laid down in *Dorado* and its successors to determine if all or any part of the tape should be excluded, or whether the transcribed confession was admissible. The reason for this failure was the trial court's apparent belief that the rule of *Dorado* did not apply to penalty trials.

After the tape was played, defense counsel moved to strike it. The court denied this motion, saying: "It should be remembered that we are here concerned with penalty. The matter of the use of these confessions or admissions establishing guilt has already been determined. [Defendant had pleaded guilty.] They are left in for the limited purpose of the issue here involved." In denying defendant's motion for a new trial the court again expressed its understanding that *Dorado* does not apply to penalty trials. This belief was erroneous. (*People* v. *Polk,* 63 Cal.2d 443, 449-450 [47 Cal.Rptr. 1, 406 P.2d 641].)

The failure of the court to examine the evidence involving the tape and the transcribed confession in light of the principles announced in *Dorado* and the cases following it was reversible error. It was held in *People* v. *Schader,* 62 Cal.2d 716, 727 [44 Cal.Rptr. 193, 401 P.2d 665] : "Just as the trial judge should find that a confession is voluntary before it may be admitted (*Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed. 2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205] ; . . . ), he should find, before admitting the confession, that it was not obtained in violation of defendant's right to counsel." The Supreme Court in *Jackson* v. *Denno,* 378 U.S. 368, 380 [12 L.Ed.2d 908, 918, 84 S.Ct. 1774, 1 A.L.R.3d 1205], emphasized that "A defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." Here it is clear that the trial court did not "actually and reliably determine" that the confessions were not obtained in violation of defendant's right to counsel.

Had such an inquiry been made, it is clear that part of the tape and all of the transcribed confession should have been excluded. Defendant's first statements contained in the taped confession, were, of course, admissible, having been made at the investigatory stage.[1] But at some point during this 55-

---

[1] See *People* v. *Dorado, supra,* 62 Cal.2d 338, 354, footnote 8: "The confession given in the following hypothetical situation put by the Attorney General is obviously admissible: 'What about the person who is not

minute period of questioning, and certainly after the officers other than Hestand took part in the interrogation, the stage ceased to be "investigatory" and became "accusatory." The police were then under a duty to advise defendant of his rights to counsel and to remain silent, before the interrogation proceeded. As this warning was never given, the portion of the tape which was recorded after this point was reached is inadmissible.

It was held in *Dorado* that the accusatory stage is reached when "(1) the investigation was no longer a general inquiry into an unsolved crime but had begun to focus on a particular suspect, (2) the suspect was in custody, (3) the authorities had carried out a process of interrogations that lent itself to eliciting incriminating statements. . . ." (*People* v. *Dorado, supra,* 62 Cal.2d 338, 353.) At *some* point in this interrogation, the police knew a crime had been committed and that it had been committed by defendant. Thereafter the investigation had "begun to focus" on him. Since it is obvious that the police would not have allowed defendant to walk away when that point was reached, he was then under restraint and "in custody," even though he had not formally been placed under arrest. (Cf. *People* v. *Furnish,* 63 Cal.2d 511, 516 [47 Cal.Rptr. 387, 407 P.2d 299].)

As for the third requirement, at some point the process of interrogations ceased to be directed at discovering whether defendant was a crank or a fraud seeking punishment or publicity for a crime he had not committed and began to be directed primarily at obtaining incriminating statements for use at trial. At that point, the process of interrogations shifted to one which "lent itself to eliciting incriminating statements."

When this last point was reached is a question that should have been determined in the first instance by the trial court. As pointed out in *People* v. *Stockman,* 63 Cal.2d 494, 498-499 [47 Cal.Rptr. 365, 407 P.2d 277], the burden is on the prosecution to prove that incriminating statements were the result of something other than a process of interrogations that lends itself to eliciting incriminating statements. In determining the point at which the primary interest of the police was no longer to discover whether defendant was a fraud, the court

known as a suspect but wants to confess an unsolved crime? . . . Shall the police stop him when he rushes into a police station and cries in distress that he wants to confess to a crime and tell him to be quiet until an attorney is obtained to represent him?' "

should have considered the fact that Officer Hestand had been at the scene of the crime and knew many of the details, and that as the interrogation progressed, it became obvious that defendant knew more and more of these details. During the interrogation, defendant correctly stated the name and location of the store, the fact that the attendant had a gun and had fired it, roughly the number of times he was shot, the location of the wounds, the date of the killing and the approximate time. Subsequently defendant stated that he used .32 caliber bullets. At some point during this recounting of the details, Hestand must have heard enough to become sure that defendant was in fact involved in the crime. When this point was reached is primarily an issue of fact which should have been determined by the trial court judge, who acts as the fact finder where the admissibility of evidence is the issue.

Obviously, had the trial court under the rules announced in *Dorado* considered the admissibility of the transcribed confession taken at downtown police headquarters, it should have excluded that confession. There is no evidence showing that this confession was obtained by something other than a process of interrogations that lent itself to eliciting incriminating statements, so the prosecution did not sustain its burden. (*People* v. *Stockman, supra,* 63 Cal.2d 494, 498-499.)

Thus errors occurred in the admission of these confessions. This is undoubtedly true as to the transcribed confession, and I believe it to be true as to the second part of the taped confession. The per se prejudicial error rule is probably applicable to these errors. (*Payne* v. *Arkansas,* 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844]; *Gideon* v. *Wainwright,* 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R..2d 733]; *Tumey* v. *Ohio,* 273 U.S. 510 [71 L.Ed. 749, 47 S.Ct. 437, 50 A.L.R. 1243]; *Lynumn* v. *Illinois,* 372 U.S. 528 [9 L.Ed.2d 922, 83 S.Ct. 917]; *Malinski* v. *New York,* 324 U.S. 401 [89 L.Ed. 1029, 65 S.Ct. 781]; *Spano* v. *New York,* 360 U.S. 315 [3 L.Ed.2d 1265, 79 S.Ct. 1202]; *Haynes* v. *Washington,* 373 U.S. 503 [10 L.Ed.2d 513, 83 S.Ct. 1336]; *Jackson* v. *Denno, supra,* 378 U.S. 368; see discussion in *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) But even if the per se prejudicial error rule were not applicable there can be no doubt at all that the admission of these confessions, particularly the second part of the taped confession, was prejudicial. As already pointed out this is an appeal solely from the penalty judgment. On a penalty trial, unlike a guilt trial, the jury has absolute and unguided discretion in fixing the penalty. It must determine that issue without the benefit

of guideposts, standards, and other applicable criteria. For that reason it has been held that in determining the question of prejudice when the death penalty has been imposed any substantial error may have affected the result and require a reversal, even if it would have been nonprejudicial in the guilt trial. (*People* v. *Price,* 63 Cal.2d 370, 373 [46 Cal.Rptr. 775, 406 P.2d 55] ; *People* v. *Treloar,* 61 Cal.2d 544, 550 [39 Cal.Rptr. 386, 393 P.2d 698] ; *People* v. *Varnum,* 61 Cal.2d 425, 429 [38 Cal.Rptr. 881, 392 P.2d 961] ; *People* v. *Kroeger,* 61 Cal.2d 236, 248 [37 Cal.Rptr. 593, 390 P.2d 369] ; *People* v. *Hamilton,* 60 Cal.2d 105, 135-138 [32 Cal.Rptr. 4, 383 P.2d 412] ; *People* v. *Hines, supra,* 61 Cal.2d 164, 168-170.) The test as to reversible error, generally, for a federal constitutional error, which this was, is stated as follows in *Fahy* v. *Connecticut,* 375 U.S. 85, 86 [11 L.Ed.2d 171, 173, 84 S.Ct. 229] : ''The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.'' This rule was approved in *Chapman, supra,* pages 710-711 where it was said ''We, therefore, do no more than adhere to the meaning of our *Fahy* case when we hold, as we now do, that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.''

It must be remembered that the statement given by defendant at the outset of the questioning by Officer Hestand differs greatly from the statements subsequently made which, had there been no error, might have been excluded. Defendant's statements at the outset indicated that the attendant of the liquor store fired first and that defendant returned the shots. As the interrogation continued defendant admitted that he did not know who shot first, and then he made ambiguous remarks which could be interpreted as meaning that he intended to kill the attendant in any event to prevent identification. After the other officers started to participate in the interrogation, defendant clearly stated that before entering the store he had intended to kill whoever was behind the counter. Thereafter he made statements which indicated that he felt no remorse and stated that during the gun battle he considered the attendant a ''dirty son of a bitch.''

His testimonial confession also differed significantly from the last part of the taped confession. In his testimony he stated that he wanted to die but did not have the courage to kill himself, so he planned to kill so that the state would execute him; that after he entered the store he realized that

he "couldn't shoot him just like that"; that he did not shoot the attendant until the attendant pulled out a gun and fired. This, of course, differs from the taped confession where he had stated he killed to prevent identification. Contrary to the last part of the taped confession, in his testimony at trial he expressed remorse for the killing.

Such matters as the nature and facts and circumstances of the crime, whether defendant is arrogant about the killing or expresses remorse, and other such factors are likely to affect the penalty. (*People* v. *Hines, supra,* 61 Cal.2d 164, 169.) Tested by applicable standards the error must be held to have been prejudicial.

*People* v. *Jacobson, supra,* 63 Cal.2d 319, and *People* v. *Cotter, supra,* 63 Cal.2d 386, do not establish a contrary rule. They merely establish that on the guilt trial a good confession followed by a bad one, under the circumstances of those cases and where the good and bad ones are not significantly different, may minimize the error in admitting the bad one. Those cases do not deal with a situation where there is a good confession, followed by a bad one adding significant and meaningful details, followed by a testimonial confession, significantly different from the bad confession. More importantly, in both these cases certain confessions were held admissible but others were held inadmissible, and it was held that it was error to admit them. The error was held nonprejudicial under the facts. In *People* v. *Gilbert, supra,* 63 Cal.2d 690, 700 [47 Cal. Rptr. 909, 408 P.2d 365], it was held in both the cited cases "that the fact that a defendant is willing to confess and has already volunteered incriminatory statements and confessions does not absolve the police of the duty to advise him of his constitutional rights before eliciting further confessions at stationhouse interrogations."

In the present case as well as in *Jacobson, Cotter,* and *Gilbert* a spontaneous statement by the defendant, which is admissible, was followed by the elicitation of further statements by a process of interrogation after suspicion had focused on him. Such further statements are not admissible and the cited cases so held. They "were not spontaneous, unsolicited declarations but detailed statements obtained through a period of prolonged interrogation." (*People* v. *Gilbert, supra,* 63 Cal.2d at p. 700.)

It must be remembered that the fact that a defendant spontaneously volunteers a confession does not mean that he is without the need for the guiding hand of counsel when the

police thereafter commence a process of interrogation. To the contrary, having admitted the killing, a defendant will not ordinarily dispute the details of the crime with interrogating officers. The defendant who has confessed to the killing may not see the importance of matters relating to the degree of the crime or the penalty and may accept intentional or unintentional suggestions of the officers as to those matters even where they are contrary to the facts. In short, such a defendant is in a vulnerable position and needs the aid of counsel. However, no sound purpose is served by dwelling upon this question because it must be deemed settled by *Jacobson, Cotter,* and *Gilbert,* that *Dorado* is applicable when officers embark on a process of interrogations designed to elicit incriminating statements after the defendant has spontaneously volunteered a confession.

*Jacobson, Cotter,* and *Gilbert* may not be distinguished from the instant case on the ground that in those cases there were short intervals between the spontaneous, admissible statements and the elicited, inadmissible statements. Such a distinction would mean that officers could avoid the *Escobedo-Dorado* rule whenever a suspect makes an unsolicited statement by immediately questioning him, without letup, even for hours, and thereby with impunity engage in the very conduct *Escobedo* and *Dorado* were designed to prevent. Application of that rule should not turn on the purely formal question whether there was a short interruption in the questioning.

There can be no doubt that Officer Hestand had the legal right to interrogate defendant to determine that he was not a publicity seeker or a fraud, or was not mentally deranged. But when defendant demonstrated his knowledge of the details of the crime the right to further interrogation without giving the required warning ceased. As soon as suspicion reasonably focused on defendant the right to question him further without the warnings was lost.

Thus there were errors, such errors were certainly substantial, and they require a reversal.

Appellant's petition for a rehearing was denied May 4, 1967. Roth, J. pro tem.,* sat in place of Mosk, J., who deemed himself disqualified. Peters, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.