Filed 10/25/17; pub. order 11/7/17 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ROBERT JOSEPH FOREST,<br><br>　　　Defendant and Appellant. | A148330<br><br>(Mendocino County<br>Super. Ct. No. SCUK-CRCR1027413) |

**INTRODUCTION**

On November 8, 2006, Robert Forest pointed a handgun at Stanley Douglass. Forest was arrested the next day and charged with felony assault with a deadly weapon. (Pen. Code, § 245, subd. (a)(2).)[1] Following a preliminary hearing, he was held to answer, and his motion to set aside the information was denied, but the case never went to trial. On January 18, 2008, the trial court granted the prosecution's motion to dismiss the information for insufficient evidence. On October 7, 2008, Forest unsuccessfully applied to the superior court for a finding of factual innocence. (§ 851.8, subd. (c).) Defendant unsuccessfully appealed from that decision. In 2016, defendant unsuccessfully sought to vacate the superior court's prior judgment denying his 2008 application by petitioning for a writ of *coram nobis*. He appeals the denial of that petition. We deny the petition on the merits.

---

[1] Unless otherwise indicated, all further statutory citations are to the Penal Code.

## STATEMENT OF HISTORICAL AND PROCEDURAL FACTS[2]

"At approximately 5:20 p.m. on November 8, 2006, Jacob Long was driving by the Tip Top Lounge on North Franklin Street in Fort Bragg when he heard some yelling and loud obscenities. Long's car window was open and he looked over and saw two men in an altercation. He saw defendant holding a gun to the head of an African-American man (subsequently identified as Stanley Douglass). Defendant was yelling obscenities at Douglass, and was holding him by the back of his shirt with one hand and had the gun to his head with the other. Douglass looked scared. Long recalled defendant telling Douglass, '[D]on't mess with me' or 'don't fuck with me.' Long thought that defendant was going to kill Douglass. Douglass did not make any threatening gestures and 'stood there in shock.' Douglass walked away quickly; defendant got on his motorcycle and left. Long called 911.

"Douglass testified that on the day of the incident, he was standing with his friend on the street when defendant walked by. Douglass asked defendant for a cigarette. Defendant responded something other than 'no,' so Douglass followed him and asked him, '[W]hat did you say?' Defendant responded aggressively and said 'some profanity.' Defendant then pulled a gun out, and grabbed him. Defendant said something about shooting it. Douglass did not physically threaten defendant in any way and tried to walk

---

[2] Our summary of the historical and procedural facts is drawn verbatim from Division Four's unpublished opinion in *People v. Robert Joseph Forest* (Aug. 3, 2010, A124144 (*Forest I*)).

Although the court below took judicial notice of the entire preliminary hearing transcript, it was not included in the record on appeal. Citation of Division Four's prior unpublished opinion is permitted by California Rules of Court, rule 8.1115(b) to explain the factual background of the case and as law of the case. It is not cited as legal authority. (*Pacific Gas & Electric Co. v. City and County of San Francisco* (2012) 206 Cal.App.4th 897, 907, fn. 10; *The Utility Reform Network v. Public Utilities Com.* (2014) 223 Cal.App.4th 945, 951, fn. 3.)

2

away.  Defendant pointed the gun at Douglass's face and then toward his back.  Douglass thought that he could have died that day.

"Sergeant Mary Ann Miller testified that defendant came to the police station on the morning of November 9, 2006, and gave her his .32 caliber handgun.  He told her that he had used the gun the previous evening for self-defense purposes.

"The trial court held defendant to answer, finding that the evidence was sufficient to show that defendant committed an assault with a firearm.

"Defendant moved to dismiss the information pursuant to section 995, contending that the magistrate erred in excluding the testimony of Sergeant Brandon Lee regarding statements defendant made to Lee, and that the prosecution failed to adduce sufficient evidence at the preliminary hearing because Douglass's testimony lacked credibility and was contradictory.  The court denied the motion, concluding the magistrate's ruling that Lee's testimony was not reasonably likely to establish an affirmative defense was proper. The court noted that:  (1) there was eyewitness testimony defendant was holding a gun to the victim's head; (2) substantial evidence supported the magistrate's determination of credibility, and (3) in any event, it would not substitute its judgment as to the weight of the evidence for that of the magistrate.

"On January 18, 2008, the People moved to dismiss the complaint on the ground of insufficient evidence.  The court granted the motion.

"On October 7, 2008, defendant petitioned for a finding of factual innocence pursuant to section 851.8.  In support of the petition, he submitted his declaration setting forth his version of the incident in which he averred that Douglass grabbed his jacket and demanded a cigarette.  Defendant responded by telling him that his conduct was a crime and could get him hurt.  Defendant said that Douglass followed him and yelled that he was going to 'f— [defendant] up' and said he was a gang-banger from San Francisco. Defendant became apprehensive and when Douglass placed his hand behind his back, defendant, in fear for his life, drew his pistol to make Douglass back off.  Defendant also

3

submitted the declaration of Stephen Soria[,] who stated that he witnessed the incident. He averred that he saw an African-American man approach defendant, tug on his jacket, and ask him for a cigarette. Defendant said 'no' and pushed the African-American man away. The African-American man followed defendant and they exchanged words. Defendant told the African-American man to get away from him. Defendant reached into his jacket pocket, pulled out a small pistol, and pointed it at the African-American man. They struggled for a few seconds before defendant backed away, put the gun back in his pocket, and walked back to his motorcycle.

"The court denied the petition, finding that the People presented substantial evidence that reasonable cause existed to believe that defendant assaulted Douglass with a firearm, and that defendant did not act in self-defense." (*Forest I*, *supra*, A124144, at pp. *1–*3.)

On August 3, 2010, Division Four of this court affirmed the trial court's ruling in an unpublished opinion, as noted in footnote 2, *ante*. On October 20, 2010, the California Supreme Court denied review. (*People v. Forest*, S186284.) On March 7, 2011, the United States Supreme Court denied certiorari (*Forest v. California* (2011) 562 U.S. 1272.) On January 13, 2016, after filing two civil lawsuits arising out of the same 2006 arrest,[3] Forest filed a "Petition for Writ of Error *Coram Nobis* and For a Finding of Factual Innocence" in the Mendocino County Superior Court, seeking to vacate that court's prior judgment finding against him in the original factual innocence matter.

---

[3] *Forest v. Lintott* (Super. Ct. Mendocino County, 2016, No. SCUK CVPO 11-58996); *Forest v. City of Fort Bragg* (N.D.Cal. July 13, 2011, No. CV 09-05970-NJV) 2011 U.S. Dist. LEXIS 160233; *Forest v. City of Fort Bragg* (9th Cir. 2013) 520 Fed.Appx. 616).

4

## DISCUSSION

### *Jurisdiction*

Defendant filed his petition for writ of error *coram nobis* in the Mendocino County Superior Court. There is no judgment of conviction to collaterally attack: the charged violation of section 245, subdivision (a)(2) was dismissed before trial. The judgment defendant attacks is the Mendocino County Superior Court's order denying his petition for a finding of factual innocence. (§ 851.8.)[4] That order was appealed to the

---

[4] Section 851.8 provides in relevant part:

(b) . . . A finding of factual innocence and an order for the sealing and destruction of records pursuant to this section shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. In any court hearing to determine the factual innocence of a party, the initial burden of proof shall rest with the petitioner to show that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made. If the court finds that this showing of no reasonable cause has been made by the petitioner, then the burden of proof shall shift to the respondent to show that a reasonable cause exists to believe that the petitioner committed the offense for which the arrest was made. If the court finds the arrestee to be factually innocent of the charges for which the arrest was made, then the court shall order the law enforcement agency having jurisdiction over the offense, the Department of Justice, and any law enforcement agency which arrested the petitioner or participated in the arrest of the petitioner for an offense for which the petitioner has been found factually innocent under this section to seal their records of the arrest . . . .

"(c) In any case where a person has been arrested, and an accusatory pleading has been filed, but where no conviction has occurred, the defendant may, at any time after dismissal of the action, petition the court that dismissed the action for a finding that the defendant is factually innocent of the charges for which the arrest was made. A copy of the petition shall be served on the prosecuting attorney of the county or city in which the accusatory pleading was filed at least 10 days prior to the hearing on the petitioner's factual innocence. The prosecuting attorney may present evidence to the court at the hearing. The hearing shall be conducted as provided in subdivision (b). If the court finds the petitioner to be factually innocent of the charges for which the arrest was made, then the court shall grant the relief as provided in subdivision (b).

"(d) In any case where a person has been arrested and an accusatory pleading has been filed, but where no conviction has occurred, the court may, with the concurrence of the prosecuting attorney, grant the relief provided in subdivision (b) at the time of the dismissal of the accusatory pleading."

5

First District Court of Appeal and affirmed by Division Four of this court. (*Forest I,* *supra*, A124144.) Review was denied by the California Supreme Court. (*People v. Forest*, review den. Oct. 20, 2010, S186284.) The remittitur issued October 27, 2010.

Section 1265 states in relevant part: "(a) . . . [I]f a judgment has been affirmed on appeal no motion shall be made or proceeding in the nature of a petition for a writ of error coram nobis shall be brought to procure the vacation of that judgment, *except in the court which affirmed the judgment on appeal.* When a judgment is affirmed by a court of appeal and a hearing is not granted by the Supreme Court, the application for the writ shall be made to the court of appeal." (Italics added.)

While it is often stated that the writ is not available where the defendant has a remedy by appeal or other adequate remedy (*People v. Kim* (2009) 45 Cal.4th 1078, 1093–1094) (*Kim*), in fact, by its very terms section 1265 contemplates that a writ of error *coram vobis* will lie to vacate a judgment that has been affirmed on appeal. "[A] petition for a writ of error *coram nobis* is regarded, in practical effect, as a motion to vacate a judgment [citation], and is neither a new adversary suit nor an independent action, but simply a part of the proceedings in the case to which it relates." (*People v. Sica* (1953) 116 Cal.App.2d 59, 61–62 (*Sica*).) Pursuant to section 1265, the appellate court retains jurisdiction to entertain a petition to vacate the judgment it affirmed. Thus, by operation of the statute, once a judgment has been appealed, the appellate court has the exclusive jurisdiction to adjudicate a *coram nobis* petition.

It follows the Mendocino County Superior Court had no jurisdiction to hear and adjudicate the merits of defendant's *coram nobis* petition. (*Sica, supra*, 116 Cal.App.2d at pp. 60–63; *People v. Mort* (1963) 214 Cal.App.2d 596, 599–600; *People v. Allenthorp* (1966) 64 Cal.2d 679, 680–682 (*Allenthorp*); *People v. Malveaux* (1996) 50 Cal.App.4th 1425, 1429–1430, 1434–1436.)

The upshot is that while a postjudgment order denying a motion to vacate the judgment or writ of error *coram nobis* in the superior court is generally appealable (*Ryan*

6

*v. Rosenfeld* (2017) 3 Cal.5th 124, 134; *Allenthorp, supra*, 64 Cal.2d at p. 682), by virtue of section 1265, defendant's appeal from the superior court's order below is a non-starter. We may dismiss the appeal. (*Sica, supra*, 116 Cal.App.2d at p. 64.) We may also treat the appeal as an original proceeding in this court for a writ of error *coram vobis*. (*People v. Brady* (1973) 30 Cal.App.3d 81, 83 (*Brady*); *People v. Kennedy* (1953) 116 Cal.App.2d 273, 275–277 (*Kennedy*).) "The basis for the issuance of a writ of error *coram nobis* is substantially the same as for a writ of error *coram vobis*" (*In re Lindley* (1947) 29 Cal.2d 709, 726) (*Lindley*), except that *coram vobis* is addressed to the appellate court that affirmed the judgment, and *coram nobis* is addressed to the trial court that issued the judgment. (*People v. Welch* (1964) 61 Cal.2d 786, 790; *Betz v. Pankow* (1993) 16 Cal.App.4th 931, 941, fn. 5 (*Betz*); Appeals and Writs in Criminal Cases (Cont.Ed.Bar 3d ed. 2017) §11.1, p. 11-2).) To conserve scarce judicial resources, we elect to treat the appeal as a petition for writ of error *coram vobis* in this court and the record in the inoperative appeal as the record in this original proceeding. (Cf. *People v. Vaitonis* (1962) 200 Cal.App.2d 156, 163 [treating record on inoperative appeal as an original petition for writ of habeas corpus].)[5]

---

[5] We take judicial notice of the record on appeal, which includes all the matters defendant asked the trial court to judicially notice. On our own motion, we also take judicial notice of the opinions only in *Forest v. City of Fort Bragg*, *supra*, 2011 Dist. LEXIS 160233 and *Forest v. City of Fort Bragg*, *supra*, 520 Fed.Appx. 616, insofar as they are relevant to the history of defendant's attempts to invalidate his arrest. The trial court took judicial notice of the *record of the proceedings* in those cases, but those records are not part of the record on appeal before us and we therefore do not take judicial notice of them.

For that reason, we also do not take judicial notice of the preliminary hearing in *People v. Forest* (Super. Ct. Mendocino County, 2006, No. MCTM-CRCR-06-74772-02). A petition for writ of error *coram nobis* is technically a civil remedy. (*People v. Fowler* (1959) 175 Cal.App.2d 808, 810, disapproved on another point in *People v. Shipman* (1965) 62 Cal.2d 226, 231 (*Shipman*).) Whether viewed as civil or criminal, however, as the purported appellant, it was defendant's burden to ensure an adequate record for the court's review. (See Cal. Rules of Court, rules 8.120 [civil appeals]: 8.320, 8.324 [criminal appeals]; Ct.App., First Dist., Local Rules, rule 7.) Although the trial

This has implications for our standard of review. We do not review the merits of the superior court's order denying the *coram nobis* petition for abuse of discretion. (*People v. McElwee* (2005) 128 Cal.App.4th 1348, 1352; *People v. Superior Court* (*Zamudio*) (2000) 23 Cal.4th 183, 192; *People v. Ibanez* (1999) 76 Cal.App.4th 537, 544.) Instead, we "review the lower court's judgment" (6 Witkin & Epstein, Cal. Crim. Law (4th ed. 2012) Criminal Writs, § 120 [*Coram Vobis* in Appellate Court], pp. 739–740), here the superior court's order denying the petition for factual innocence. The writ of error *coram vobis* permits the appellate court to command a trial court to reconsider its decision in light of evidence discovered during the pendency of an appeal (*Betz, supra*, 16 Cal.App.4th at p. 941) or after the appeal is over. (§ 1265; 6 Witkin, Cal. Crim. Law Criminal Writs (4th ed. 2012) § 191 [Revival of Common Law Writ], pp. 236–237.) Those few Courts of Appeal which have either entertained original writs of *coram vobis* or repurposed inoperative appeals as original writs of *coram vobis* do not identify the standard of review; however, it appears an appellate court independently evaluates whether the newly discovered fact presented in the petition warrants relief. (*Welch*, *supra*, 61 Cal.2d at pp. 794–795; *Brady*, *supra*, 30 Cal.App.3d at p. 86; *Kennedy*, *supra*, 116 Cal.App.2d at p. 274.) In our view, this is a mixed question of law and fact which we review de novo, much like the question whether a habeas corpus petitioner has proven

court took judicial notice of the preliminary hearing transcript, inexplicably it was not included in the record on appeal. Since the gravamen of defendant's complaint is that he is factually innocent and should never have been arrested or held to answer in the first place, the transcript of the preliminary hearing is critical to review of his claim.

Inasmuch as the preliminary hearing transcript is not a part of the record on appeal, we would not have any basis for assessing the facts on which the judgment was rendered, but for this court's prior opinion in *Forest I*, *supra*, A124144, including the court's detailed recitation of the facts adduced at the preliminary hearing. Since the court's prior opinion is law of the case insofar as it found the historical facts, we accept the recited facts as supported by substantial evidence and will exercise our discretion to address the merits of the appeal despite the gap in the record. (*Krug v. Maschmeier* (2009) 172 Cal.App.4th 796, 799, fn. 1.)

8

by a preponderance of the evidence facts that establish a basis for relief. (*In re Lucas* (2004) 33 Cal.4th 682, 694.) As in such proceedings, where the evidentiary record consists of exhibits attached to the petition, we independently review the record. (*In re Smith* (2003) 114 Cal.App.4th 343, 360–361; *In re Zepeda* (2006) 141 Cal.App.4th 1493,1497.)

***The Judgment Under Attack***

By this petition, defendant collaterally attacks the 2008 judgment of the Mendocino County Superior Court denying his petition for a factual finding of innocence. Section 851.8 sets forth the standard for such a finding: "A finding of factual innocence 'shall not be made unless the court finds that no reasonable cause exists to believe that the arrestee committed the offense for which the arrest was made.' (§ 851.8, subd. (b).)" (*People v. Medlin* (2009) 178 Cal.App.4th 1092, 1101 (*Medlin*).) "[T]he record must exonerate, not merely raise a substantial question as to guilt." (*People v. Adair* (2003) 29 Cal.4th 895, 909 (*Adair*).)

"A person petitioning for a finding of factual innocence has the initial burden to demonstrate the absence of reasonable cause. To meet this burden, the petitioner must show more than a viable defense to the crime. He or she must establish ' "that there was no reasonable cause to arrest him in the first place." ' [Citation.] If this burden is met, the burden shifts to the prosecution to demonstrate the existence of reasonable cause." (*Medlin, supra*, 178 Cal.App.4th at p. 1102.) Reasonable cause means " ' "that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." ' " (*Adair, supra*, 29 Cal.4th at p. 904.) "To be entitled to relief under section 851.8, '[t]he arrestee [or defendant] thus must establish that facts exist which would lead no person of ordinary care and prudence to believe or conscientiously entertain any honest and strong suspicion that the person arrested [or acquitted] is guilty of the crimes charged.' " (*Adair*, at p. 904.) Whether there is "no reasonable cause" to arrest in the first place is an objective

question measured by an external standard. (*Id.* at p. 906; *People v. Esmaili* (2013) 213 Cal.App.4th 1449, 1460 (*Esmaili*).) Even a magistrate's order discharging a defendant after a preliminary hearing does not establish his or her factual innocence, because "it still might be the case that another person of ordinary care and prudence could view the evidence differently and have some suspicion of the defendant's guilt." (*Esmaili*, at pp. 1460; *People v. Bleich* (2009) 178 Cal.App.4th 292, 301.) Showing that one had a "viable substantive defense" is not enough. (*Adair*, at p. 905; *Esmaili*, at p. 1460.) Here, defendant claimed he was factually innocent because he acted in self-defense. Both the trial court and the appellate court rejected that contention.

To successfully mount a collateral attack on a judgment by way of petition for a writ of error *coram nobis* or *coram vobis*, the defendant faces a similarly daunting challenge. "[N]ewly discovered evidence does not justify relief unless it is of such character as will completely undermine the entire structure of the case upon which the prosecution was based." (*Lindley*, *supra*, 29 Cal.2d at p. 723.) "[W]hether raised in a petition for writ of habeas corpus or by *coram nobis*, newly discovered evidence is a basis for relief only if it undermines the prosecution's entire case. It is not sufficient that the evidence might have weakened the prosecution case or presented a more difficult question for the judge or jury." (*In re Clark* (1993) 5 Cal.4th 750, 766.) " '[A] criminal judgment may be collaterally attacked on the basis of "newly discovered" evidence only if the "new" evidence casts fundamental doubt on the accuracy and reliability of the proceedings. . . . [S]uch evidence, if credited, must undermine the entire prosecution case and point unerringly to innocence or reduced culpability.' " (*Ibid.*, quoting *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1246, superseded by statute as stated in *People v. Steele* (2004) 32 Cal.4th 682, 691.)

***Requirements for Issuance of the Writ***

"The writ of [error] *coram nobis* is granted only when three requirements are met. (1) Petitioner must 'show that some fact existed which, without any fault or negligence

10

on his part, was not presented to the court at the trial on the merits, and which if presented would have prevented the rendition of the judgment.' [Citations.] (2) Petitioner must also show that the 'newly discovered evidence . . . [does not go] to the merits of issues tried; issues of fact, once adjudicated, even though incorrectly, cannot be reopened except on motion for new trial.' [Citations.] This second requirement applies even though the evidence in question is not discovered until after the time for moving for a new trial has elapsed or the motion has been denied. [Citations.] (3) Petitioner 'must show that the facts upon which he relies were not known to him and could not in the exercise of due diligence have been discovered by him at any time substantially earlier than the time of his motion for the writ." (*Shipman*, *supra*, 62 Cal.2d at p. 230.) "These factors set forth in *Shipman* continue to outline the modern limits of the writ." (*Kim, supra*, 45 Cal.4th at p. 1093.) The granting of a writ of error *coram nobis* is completely discretionary. (*People v. Evans* (1960) 185 Cal.App.2d 331, 333.)

### Defendant's Showing of New Facts

In a verified petition for writ of error *coram nobis*, defendant proffers three "newly discovered" facts: (1) a statement made by former District Attorney Meredith Lintott in 2015, to settle a civil lawsuit filed by defendant against her for defamation; (2) the sworn deposition of Sergeant Lee, a Fort Bragg police officer, who took defendant's statement the day after the altercation; and (3) the stipulation of a current deputy district attorney to a finding of factual innocence. We assess the merits of the petition de novo, as if it had been filed in this court in the first instance.

### 1. Lintott's Statement of Retraction

Meredith Lintott's retraction stated: "In 2010, during my campaign to be re-elected District Attorney, I published a political campaign advertisement on the radio which stated or implied that Mr. Robert Forest had felony charges pending against him, that he had assaulted an unarmed man with a firearm, and that he had bribed my opponent to obtain a permit to carry a concealed weapon. Robert Forest did not bribe

11

anyone. Mr. Forest did not have any criminal charges pending against him *and he did not commit an assault on an unarmed man with a gun. I personally dismissed all of the criminal charges that were pending* against him more than 2 years before my campaign advertisement was broadcast on the radio. *I want to confirm that I made the right decision when I dismissed the charges that were pending against Mr. Forest.* I apologize for the harm my statements have caused Mr. Forest, his family, and his businesses. [Signed] Meredith Lintott" (Italics added.) The statement was not sworn under penalty of perjury and, as noted, was part of the settlement of a lawsuit filed by defendant against her for defamation.

Lintott's statement fails to establish a basis for *coram vobis* relief for several reasons. First, it is not a "fact." Whether or not a set of circumstances amounts to the commission of an assault with deadly weapon is a legal opinion. "The uniform conclusion of the decisions is that the function of a writ of error *coram nobis* is to correct an error of fact. It never issues to correct an error of law." (*People v. Reid* (1924) 195 Cal. 249, 258; accord *Kim*, *supra*, 45 Cal.4th at p. 1093 [" '[t]he remedy does not lie to enable the court to correct errors of law.' "].) "[I]t 'is not intended to authorize any court to review and revise its opinions.' " (*People v. Tuthill* (1948) 32 Cal.2d 819, 822.)

*People v. Esquibel* (1975) 44 Cal.App.3d 591 (*Esquibel*) is instructive. At the defendant Esquibel's criminal trial, the victim testified he thought Esquibel had deliberately hit him with his pickup truck. (*Id.* at p. 593.) Defendant was convicted of assault (§ 245, subd. (b).) (*Esquibel*, at p. 593.) About two years later, in connection with a personal injury lawsuit the victim brought against Esquibel, the victim talked to an eyewitness who told him Esquibel was not looking at the victim when the truck hit him. (*Ibid.*) This eyewitness had testified at trial, but no one had asked him which way defendant was looking when he hit the victim. However, the victim testified at a deposition that, based on what the eyewitness had told him, he now believed the defendant's actions were " 'entirely accidental and negligent.' " (*Id.* at p. 594.) Based on

12

the discrepancy, the defendant brought a petition for writ of error *coram nobis*, which the trial court granted. The People appealed and Esquibel argued the victim's change of opinion is a basis for *coram nobis* relief. (*Ibid.*) The Court of Appeal reversed, stating, among other reasons, that "[t]he allegedly contradictory testimony of [the victim] involves his opinions, not facts. Forming a new opinion based on a recently learned fact which could have been brought out at trial is not a basis for relief under *coram nobis*." (*Id.* at p. 595.)

The situation here is analogous. In 2008, in opposition to defendant's petition for a finding of factual innocence, Ms. Lintott submitted a declaration under penalty of perjury stating her reasons for dismissing the assault charge against defendant in 2006. She averred that she "moved to dismiss the case based on insufficient evidence to obtain a conviction beyond a reasonable doubt." She also averred that she "believed that an objective fact finder *would* find the assault with a firearm by Robert Forest took place *if* the standard was by a preponderance of evidence, but that there was not a 'probability' of a conviction if the standard was beyond a reasonable doubt." (Original italics.) Her decision to dismiss was based on information the defense presented to her in December 2007 bearing on his asserted defense of self-defense. This information included "interviews conducted by the defendant's investigators" and a "handwritten report" by David *E.* Paoli, who was the father of David *A.* Paoli, who was married to the victim's mother. David *E.* Paoli "reported encounters with [the victim] when he was off his 'meds,' and believed that [the victim] had threatened David *A.* with a mawl and 'some gang members.' " Lintott also averred that her decision to dismiss was "strongly disapproved of" by the deputy district attorney who had filed the case and who believed he could win a conviction notwithstanding the anticipated defense evidence. Finally, Lintott averred defendant's prosecution was justified by six objective reasons: "(1) the defendant pulled a firearm on an unarmed victim and held it to his face, (2) the defendant 'had a hold of' the victim's clothing as he held the gun to his head, (3) the victim had no

13

reported record of violence, (4) the defendant at the time was parked in front of a bar where he had been drinking Tequila, (5) the defendant fled on his motorcycle instead of waiting for the police, and (6) the defendant has a criminal record (conviction under Penal Code §§ 12025(b) and 12301[*sic*]) involving a firearm."

Lintott *was not a percipient witness* to the events. Thus, her unsworn 2015 retraction could only relate to her legal opinion about whether an assault had been committed, and not a statement of fact. Furthermore, taken in its entirety, the change in Lintott's opinion does not appear to be very different from her earlier opinion. Although she states in her retraction that defendant "did not commit an assault on an unarmed man with a gun," she adds that she "want[s] to confirm that [she] made the right decision when [she] dismissed the charges that were pending against Mr. Forest." That decision, as we know from her 2008 declaration, was based on her *opinion* that she could prove assault by a preponderance of the evidence but not beyond a reasonable doubt.

Furthermore, we are not required to accept Lintott's statement at face value but may consider the circumstances under which it was made. Her statement is unsworn and was made in settlement of a lawsuit after protracted litigation, both circumstances which undermine its probative value. (*In re De La Roi* (1946) 28 Cal.2d 264, 270; *People v. Knight* (1946) 73 Cal.App.2d 532, 534.) In our view, Ms. Lintott's retraction is not a fact but an opinion of dubious provenance that could not have prevented the rendition of judgment.

### 2. Deputy Lee's Deposition

Defendant alleges that Fort Bragg Police Department Sergeant Brandon Lee's sworn deposition testimony presents the "new fact" "that, in his opinion, no probable cause existed to arrest Mr. Forest for any criminal offense." He further asserts he did "not learn that Sgt. Lee was of the opinion that there was no probable cause for his arrest until Sgt. Lee's deposition in 2014." Several documents submitted by defendant in support of his *coram nobis* petition bear on Sergeant Lee's deposition.

14

On November 9, 2006 at 9:28 a.m., Sergeant Lee interviewed defendant about an altercation the previous day in Fort Bragg. Sergeant Lee had spoken to defendant the previous evening by telephone. Defendant confessed to pointing a gun at the victim but claimed he acted in self-defense. Defendant's pre-arrest statement to Lee is largely congruent with the declaration under penalty of perjury defendant submitted to the court in 2008 on the section 851.8 petition, although there are some differences.[6]

---

[6] During his pre-arrest statement to Lee, defendant claimed he was just leaving the Headlands Café, where he had eaten a bagel and cream cheese, when the victim grabbed him by the jacket and demanded a cigarette. Defendant backed away but the victim followed him and verbally threatened to "fuck [him] up," and said he was "some kind of gang banger from Frisco." Defendant continued walking to his motorcycle. A "kid on a bike" rode by and hollered his name. Defendant thought he recognized the kid and asked him if the victim was his friend. He told the kid to get the victim away from him, but the kid did not respond. The victim was still trailing him. At this point, defendant began to think, based on what the victim had said earlier about fucking him up and being a gangbanger from Frisco, that "maybe he's armed." The victim was "coming [on] aggressively." When the victim "closed the distance where he could actually do me harm" and "his right hand went behind his back," defendant made a "snap decision" and "produced a weapon" from his jacket pocket. Later, defendant clarified the victim was close enough to hit defendant when defendant produced the weapon.

Lee said: "Right. OK, so you produced this firearm—it was loaded, . . . and you pointed it at him." Defendant responded: "Under the circumstances, I felt it was the safest thing—the only thing I could do to ensure my safety and avoid bloodshed." The victim did not produce a weapon. "[H]e backed right off" off but kept "yelling that he was going to fuck me up." Defendant yelled back, "[T]his isn't over—you're going to hear from—you guys. . . . [¶] . . . [¶] I'll carry that out." Defendant drove straight to his home to get his car because he had to pick up his daughter from a friend's house in Mendocino.

When Lee asked why defendant had parked his motorcycle so far away from the Headlands Café, defendant admitted he had been at the Tip Top first, where he had a tequila and water. "Lots of water . . . . Here's how I don't fool with motorcycles or weapons when I am under the influence. [¶] . . . [¶] I go into the Tip-Top. Sometimes, they know I have water and I sit there long enough to be quite sober before I ever leave. So that's what I was doing. [¶] . . . [¶] I sat there for a couple of hours." He went to get his gun from his saddlebag on his motorcycle, "put [his] piece in here" and then went to the Headlands Café. He had never seen the victim before.

It is clear from Sergeant Lee's comments that he was sympathetic to defendant and believed defendant was the actual victim of a crime. Lee did not testify at the preliminary hearing. "Defendant moved to dismiss the information pursuant to section 995, contending that the magistrate erred in excluding the testimony of Sergeant Brandon

---

Lee informed defendant that an independent witness had seen him chasing the victim down the street with his gun drawn. Defendant said, "That's crap," but then admitted what the witness "might have seen is when I drew my weapon he was within the—he had the ability to hurt me at that point. [¶] . . . [¶] I made contact . . . with this hand, pushed him that way and he kept moving, you know, and I might have taken a step or two, but that was it."

Defendant told Lee he "would like to file a complaint, so that this kid gets the message and you just don't grab people or make demands on them on the street and follow them and threaten them and do all that kind of stuff. [¶] . . . [¶] To me, that's a crime. Am I wrong about that?" Lee responded: "That's not incorrect. No, you're right."

Lee asked defendant why, if he felt "so threatened and so compelled," he did not come directly to law enforcement. Defendant said his daughter was everything to him, it was his habit to be responsible, and "habit probably overrode my better judgment" because he could have made other arrangements. Also, he was "pretty shook up" and "wanted to get out of the area anyway."

At this point, Lee stated that, as he had explained the previous night on the phone, "as a carrier of a concealed weapons permit," defendant had a duty to assist law enforcement and inform them that he had drawn his firearm during an altercation, "so that we don't just think there is some vigilante out there that, that you know, got into it with some guy on the street and pulled a gun on him." Lee reminded defendant that by "working alongside the law enforcement as far as keeping us, you know, abreast of your activity, you know, because the average citizen doesn't know, you don't have the same capacity . . . [¶] . . . [¶] . . . that an officer has, you know. . . . [Y]ou don't have a badge to display, you know, they don't know who you are, that you have a right to be, you know, carrying a firearm. You understand?" Defendant said he did, adding he did consider making a citizen's arrest on this kid, but he did not know if the laws had changed.

So far as the exhibit shows, Lee concluded the interview with, "OK. Alright." However, it is not clear whether the actual interview ended here, or whether this is the end of the defense excerpt from the interview only, since the exhibit appears from its footer to be a defense-created document and not a copy of the original interview transcript.

In his declaration, defendant stated that he got his bagel and cream cheese to go, and that he had *two* tequila drinks, the second one with water.

16

Lee regarding statements defendant made to Lee." (*Forest I*, *supra*, A124144, at p. *2.) The motion was denied. (*Ibid.*)

The defense team interviewed Sergeant Lee on January 8, 2008, about his previous encounters with the victim; the report of the interview was submitted to the court on the section 851.8 motion.

In his written opposition to the motion, prosecutor Tim Stoen outlined the information the prosecution team had available to it prior to the preliminary hearing. It is clear that Lee was not one of the investigating officers and he did not interview any of the percipient witnesses.[7] But the opposition states that "[o]n or about December 19, 2006, the Fort Bragg prosecutor became aware that Sgt. Lee was accusing Lt. Higdon of changing Lee's *Supplement* report as to Lee's interview of Forest. In order to make sure that Mr. Forest was being treated fairly, said prosecutor requested DA Investigator Robert Simerson to conduct his own interview of the critical third-party witness in this case, Jacob Long. Investigator Simerson interviewed Jacob . . . ." No more information is available to us because the next page of the opposition memorandum is missing.[8]

On October 14, 2014, Sergeant Lee was deposed in connection with defendant's lawsuit against Lintott. Defendant provides selective, nonconsecutive excerpts from the deposition. As relevant here, Lee testified he would not describe himself as a personal friend of defendant's, but he knew defendant as a business owner, and the two had discussed defendant's "nice motorcycle" and having been in the Marine Corps.

---

[7] Defendant alleges in his reply brief that Sergeant Lee was the "lead investigating officer of the 2006 incident" but nothing in the record supports that assertion. In fact, Sergeant Lee testified at his deposition that Officer Oscar Lopez was "the primary officer that handled the case."

[8] Lieutenant Higdon's initial report, without investigator Simerson's notes, was attached to the prosecution's original opposition but is not part of the copy reproduced for the appellate record.

17

Lee testified he first became aware of the incident between defendant and the victim on November 8, 2006 when "[i]t was explained to me by Officer Lopez and some of the other officers on duty that day that were involved or had knowledge of the matter." Defendant's wife called him to express her concern. Lee, in turn, called defendant. At that time, a BOLO had been issued for defendant's arrest. After speaking with defendant, Lee contacted Mendocino County Sheriff's Office dispatch and requested that the BOLO be "retracted" and that defendant not be arrested at that time. He did so because "no one [except him] had spoken to Mr. Forest to actually get his side of the story to find out what exactly happened" and, in his estimation, "[m]any of the statements, the witness statements that I had heard third hand at that point were not supportive of an actual assault with a deadly weapon occurring."

Lee stated in "prior testimony" that he recorded his interview with defendant on the morning of November 9, 2006. Lee testified a transcript shown to him by counsel accurately reflected the interview. Lieutenant Higdon interrupted the interview and asked to speak with Lee. Lee went to Higdon's office, where Higdon asked Lee what was taking so long. Lee explained to Higdon that "Mr. Forest was giving me . . . a statement that was much different than the story that had been explained the previous night as far as the totality of the events. And Lieutenant Higdon had told me to get it done and move on and let's get this guy in custody." Higdon ordered Lee to arrest defendant, stating something to the effect of, "This is a direct order[;] do you fucking understand a direct order?"[9]

Lee went back to defendant and "explained to him the situation. [¶] . . . [¶] I told Mr. Forest that I was being directed by my commanding officer that I was to place him under arrest and charge him with assault with a deadly weapon. And I think I explained to him twice that it was not my decision and that I was being ordered to do so."

[9] Lee testified he later learned that "at some point in the distant past Mr. Higdon and Mr. Forest both worked for the Fort Bragg Police Department."

18

Defendant asked who was making the decision and Lee "told him it was Lieutenant Floyd Higdon." At the point in time that Lieutenant Higdon ordered him to arrest defendant for a felony violation of section 245, assault with a firearm, Lee "did not" believe there was probable cause for that arrest, and he "would not have" arrested him for that offense if he had not been ordered to do so by Lieutenant Higdon. Asked if at that point in time, in his opinion, there was probable cause to believe that Mr. Forest had committed any crime, Lee responded: "I had reasonable suspicion to believe that Mr. Forest may have been guilty of brandishing a firearm, but based on the statement that he provided me that morning I was not convinced that even the 417 charge was applicable at that point."

After many more words were exchanged between Lee and Higdon about defendant, and defendant was not allowed to post bail from Fort Bragg, Lee got ready to go home. But before he went, he told defendant: "Whatever you do at this point, your rights have been violated, is up to you. [¶] . . . [¶] . . . Please, if this goes forward to a lawsuit or something of that nature, I said please leave me out of it. I said this is none of my doing. [¶] And [defendant] just kind of smiled and nodded his head. And I said you guys want to go ahead and violate his freedom and his rights, I said go right ahead. I said I'm not going to be a part of it. He has a right to bail and if he's denied that right you can expect a visit from the A.C.L.U."

Lee wrote a supplemental report. He later learned the report had been altered, and on December 12, 2006, he e-mailed Chief Mark Puthoff to tell him so. The portions of his report which had been altered included "the description of Sergeant [Mary Ann] Miller and Lieutenant Don Miller . . . being present and taking Mr. Forest's concealed weapons from him." The two Millers are married to each other; Sergeant Miller worked for the Fort Bragg Police Department, and Lieutenant Miller worked for the Mendocino County Sheriff's Office. Lee was there but did not actually observe all the information included in the report, such as, "Robert showing two loaded handguns, which Lieutenant Miller unloaded and returned to Robert." Contrary to the report, Lee never received a

19

copy of defendant's concealed weapon permit from Lieutenant Miller or firearm from Sergeant Miller. Finally, the report deleted the part where he explained "Mr. Forest's statement as far as how the confrontation . . . had built between [¶] . . . [¶] the two of them up to the event that was reported." Lee admitted that "the D.A. is the final arbiter on whether the case should proceed or not." "We have cases rejected all the time." He also testified it was "correct" that he "may have a case where the D.A. proceeds and you don't think they should."

Sergeant Lee's deposition testimony fails to support *coram vobis* relief for at least two reasons, if not more. First, as discussed above, Sergeant Lee's opinion that there was no probable cause to arrest defendant for assault with a firearm was just that, an opinion. As discussed in connection with Lintott's retraction, *coram nobis* will not lie to correct opinions or errors of law.

Second, the content of Sergeant Lee's deposition was not new to defendant. Lee told defendant that he did not believe he committed a crime; that it was not his decision to arrest him; that he was only arresting him because his commanding officer ordered him to do so; and that his rights were being violated. Defendant understood early on that Lee was sympathetic to his cause and a potential witness on his behalf; he evidently tried to use Lee as the conduit through which he could present his self-defense theory at the preliminary hearing without actually having to testify at the preliminary hearing.

Defendant surely could have learned of Lee's opinions and suspicions when his representatives actually interviewed Lee for the factual innocence hearing. And, if defendant did not know before, the prosecution's opposition to defendant's section 851.8 petition put him on notice that Lee had complained about changes to his supplemental report to his superiors and that an investigation had been initiated. At that point, defendant could have had Lee interviewed again on that topic. Failing to discover all that Lee had to say at this juncture, and presenting it to the judge who presided at his factual innocence hearing, is analogous to the failure to ask the eyewitness at trial in *Esquibel*

20

which way the defendant was looking when he hit the victim with his car. Due diligence has not been shown.

Assuming Lee's report was altered or doctored, it was not used against him in any proceeding, and even the use of false testimony to secure a conviction is insufficient to warrant *coram nobis* relief. (Appeals and Writs in Criminal Cases (Cont.Ed.Bar 3d ed. 2017) § 11.8 [*Writs of Error Coram Nobis and Coram Vobis*], pp. 11-9 to 11-10, and cases cited therein.) Nor will *coram nobis* or *vobis* lie to challenge the legality of an arrest, or the failure to prove a crime was committed, or to correct defects in the preliminary hearing. (*Ibid.* See generally, Prickett, *The Writ of Error Coram Nobis in California* (1990) 30 Santa Clara L.Rev. 1, 25 & fn. 121; 28 & fns. 139, 140; 30 & fn. 156.)

Finally, in this court's view, nothing Lee said in his deposition would have prevented rendition of judgment, even if it had been presented at the time of trial, i.e., at the factual innocence hearing.

### 3. *Stipulation to Factual Innocence by Assistant District Attorney Sequeira.*

Defendant argues that the "most important piece of new evidence" is Mr. Sequeira's stipulation that defendant is factually innocent of assault. The actual signed stipulation, if there is one, is not included in the record. Instead, what is included is the transcript of the Mr. Sequeira's unsworn statement to the court below on February 24, 2016, explaining his reasons for the entering into a stipulation. Mr. Sequeira has been a member of the Mendocino County District Attorney's Office since 2011. He was selected to review Mr. Forest's *coram nobis* petition because the district attorney had recused himself, Mr. Sequeira has 31 years of experience, and his tenure in the office postdates the events at issue and the election contest involving Lintott and the new district attorney. He had spent "many, many hours" reviewing the case. In his view, when the prior district attorney issues a statement that defendant did not commit an assault with a gun on an unarmed man, it "behooves the new district attorney to take a

21

solid look at that and give that great weight." But what weighed more heavily on him was "the disturbing evidence" that came forth during Sergeant Lee's deposition that his report was altered by someone higher up in the Fort Bragg Police Department, "probably and most likely" Lieutenant Higdon, who deliberately omitted defendant's "exculpatory statements central to the determination of whether there was an assault with a deadly weapon," and defendant's "claim of self-defense and how his confrontation with [the victim] first start[ed]." "And when the district attorney's office was notified they were slow in acting on those reports." "[G]iven the totality of the circumstances in this case," Mr. Sequeira thought "the only fair and right thing to do in a case like this is to stipulate at this point that Mr. Forest is factually innocent given the tortured history in this case."

We fail to see how the opinion of an attorney on the fairness of a process which culminated in the dismissal of a felony charge prior to trial is a new fact which would have prevented the rendition of judgment in 2008. It is first and foremost a legal opinion. Further, it is an opinion which places "great weight" on Lintott's retraction and on Lee's deposition which, as we have already discussed, will not support *coram vobis* relief. We also note that section 851.8, subdivision (d) allows the court to grant the petition upon the concurrence of the district attorney at the time of dismissal, but not otherwise.

Defendant's petition for writ of error *coram nobis* is no more than his latest attempt to persuade a tribunal to accept, as a matter of law, that he acted in self-defense when, after consuming two tequilas, he produced a gun from his pocket and pointed it at an unarmed man who obnoxiously asked him for a cigarette. The victim and an independent witness testified under oath and subject to cross-examination at the preliminary hearing. Defendant could have testified to self-defense at this time, but did not do so. Instead, he tried to present the defense through Sergeant Lee, thereby insulating himself from cross-examination. The judge who heard the evidence found probable cause to believe the evidence showed the crime of felony assault with a firearm

22

had been committed. The judge who heard the section 995 motion believed the evidence showed a felony assault with a firearm had been committed.

Defendant's self-defense claim was litigated on the subsequent motion for a finding of factual innocence. Stephen Soria's sworn statement to police on December 14, 2006, was presented to the judge who ruled on the petition. Soria was the boy on the bicycle, an additional eyewitness. He said the "black kid" approached defendant, tugged on his jacket, and said, "Sir, do you have a cigarette?" Soria did not report hearing the victim threaten defendant. The victim was following defendant closely when defendant pulled a gun out of his pocket "and pointed it at the kid." The court also considered defendant's declaration, which presented his self-defense claim in lieu of his testimony, and the transcript of the sworn testimony given at the preliminary hearing. That judge found that defendant's showing failed to establish that " ' "*no* reasonable cause to arrest him in the first place." ' " (*Medlin, supra*, 178 Cal.App.4th at p. 1102; italics added.) This court affirmed that judge's decision on appeal. Defendant has also tried to convince two federal courts that he was falsely arrested, to no avail.

Defendant now presents this court with the opinions of two attorneys and a police officer in another failed attempt to persuade us that the evidence he acted in self-defense points unerringly to his innocence. It does not. One district attorney dismissed the charge. Had she not done so, a jury might have acquitted defendant. But defendant has not presented to this court or any other court "new facts" that dispel the probability his asserted belief he was in imminent danger of suffering bodily harm was unreasonable under the circumstances, and that he used more force than was reasonably necessary to defend against the perceived danger. (CALCRIM No. 3470.) On the contrary, a reasonable person could conscientiously conclude there was probable cause to believe defendant committed an assault with firearm.

## DISPOSITION

The petition for writ of error *coram vobis* is denied on the merits.

23

_____
Dondero, J.

We concur:


_____
Margulies, Acting P. J.


_____
Banke, J.

A148330 *People v. Forest*

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ROBERT JOSEPH FOREST,<br><br>     Defendant and Appellant. | A148330<br><br>(Mendocino County<br>Super. Ct. No. SCUK-CRCR1027413) |

THE COURT:[†††]

     The opinion in the above-entitled matter, filed on October 25, 2017, was not certified for publication in the Official Reports. After the court's review of a request under California Rules of Court, rule 8.1120, and good cause established under California Rules of Court, rule 8.1105, it is hereby ordered that the opinion should be published in the Official Reports.

Dated: _____

                                        DONDERO, J.

---

[†††] Before Margulies, Acting P. J., Dondero, J., and Banke, J.

Trial Court:   Mendocino County Superior Court

Trial Judge:   Hon. John Behnke

Counsel:

Riordan & Horgan, Dennis P. Riordan, Donald M. Horgan, and Matthew Dirkes, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Jeffrey M. Laurence, Assistant Attorneys General, Gregg E. Zywicke and Bruce M. Slavin, Deputy Attorneys General, for Plaintiff and Respondent.

*A148330  People v. Forest*

2